## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TERRY R. WIGFALL
1844 Robin Court
Severn, MD  21144-3119

    *Plaintiff,*

    v.

OFFICE OF COMPLIANCE
Adams Building, Room 200
110 Second Street, S.E.
Washington, DC  20540-1999

    *Defendant.*

Serve  BARBARA J. SAPIN:
(in her official capacity as Executive
Director of the Office of Compliance)
Room LA 200, Adams Building
110 Second Street, S.E.
Washington, DC  20540-1999

Serve: The Hon. CHANNING D. PHILLIPS
United States Attorney for the
District of Columbia
ATTN: Civil Process Clerk
555 4th Street N.W.
Washington, DC  20530

Serve: The Hon. LORETTA E. LYNCH or her
Designated Representative
Attorney General of the United States
Department of Justice
Room B-103
950 Pennsylvania Ave. N.W.
Washington, DC  20530-0001

Civil Action No.   1:16-cv-2332

Next Hearing:
Date/Time:
Location:

JURY TRIAL DEMANDED

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

### I.  INTRODUCTION

**COMES NOW** Plaintiff TERRY R. WIGFALL, by and through her undersigned

counsel, who hereby brings this action against her current employer, the OFFICE OF COMPLIANCE (hereinafter "OOC" or "Employer"), for its violations of Section 201(a), 203(a), and Section 207(a) of the Congressional Accountability Act (hereinafter "CAA").

## II.  JURISDICTION AND VENUE

1.      The subject matter jurisdiction of this Court is invoked pursuant to the provisions of 2 U.S.C. §1408(a) of the CAA.   TERRY R. WIGFALL: (1) is a covered employee by virtue of her position with the OOC (a covered employing agency); (2) completed counseling and mediation pursuant 2 USC §§ 1402-03 of the CAA; and (3) filed this civil action within the time period prescribed in 2 U.S.C. §1404 of the CAA following receipt of notice of the end of mediation.

2.      Personal jurisdiction over Defendant is invoked pursuant to 2 U.S.C. §1408(b) of the CAA.

3.      Venue is proper because Defendant is predominantly located within this District and the actions complained of occurred within this District.  Furthermore, there is but one Court within the District of Columbia that is of competent, original subject-matter jurisdiction.

## III.  PARTIES AND RESPONSIBLE PERSONS

4.      Plaintiff TERRY R. WIGFALL (hereinafter referred to as "WIGFALL" or Plaintiff), a resident of Severn, Maryland, at all times relevant herein prior to, during, and after the incidents which give rise to this complaint was an employee, an independently contracted employee, or an potential employment interviewee of the OFFICE OF COMPLIANCE ("OOC").

5.      Plaintiff presently holds the position of Occupational Safety and Health ("OSH") Program Manager.  Plaintiff was initially hired into a contractor position in the OSH

Complaint for Damages and
Equitable Relief                                    Page 2 of 48                   Wigfall v Office of Compliance
Case # TBD

Program of the OOC.  Plaintiff first began working at the OOC in 2007.

6.      Plaintiff is an African American female with brown skin complexion.

7.      Plaintiff was at all times relevant herein over the age of 40.

8.      Plaintiff is a person who suffers physical reactions in her body to substances that existed within portions of the OOC workplace and that such reactions substantially limited one or more major life activities.

9.      Defendant OFFICE OF COMPLIANCE ("OOC") is a United States Government legislative agency primarily located in the United States Capitol Complex.

10.     Defendant OOC administers and ensures the integrity of the dispute resolution system established to resolve disputes that arise under the CAA; carries out an education and training program for Congressional Members, employing offices, and Congressional employees to assist them in understanding their rights and responsibilities under the CAA; and advises Congress on needed changes and amendments to the CAA. The General Counsel of the OOC has independent investigatory and enforcement authority for certain violations of the CAA.  ('About the OOC – OOC Mission', April 5, 2016, [http://www.compliance.gov/about-ooc](http://www.compliance.gov/about-ooc))

11.     Paradoxically, Plaintiff's employer, the OOC, is the agency charged by the United States Congress to provide education about, and administrative enforcement of, laws intended to protect Plaintiff from the very harms alleged herein.

12.     The Office of Compliance has a five-member, non-partisan Board of Directors. The majority and minority leaders of both the House of Representatives and the Senate appoint the members of the Board of Directors based on their expertise in employment and labor law. The Board is responsible for adjudicating disputes under the

Complaint for Damages and
Equitable Relief                                Page 3 of 48                          Wigfall v Office of Compliance
                                                                                     Case # TBD

Congressional Accountability Act (CAA), promulgating regulations implementing the CAA's statutory requirements, and recommending to Congress changes to the CAA to advance the rights of Congressional employees. ('BOARD OF DIRECTORS', November 17, 2016, http://www.compliance.gov/about-ooc/board-directors)

13. Barbara L. Camens, who appears to be a white female, was appointed in May 2000 by the Congressional leadership to serve on the Board of Directors of the Office of Compliance and has so served at all times relevant herein. She was appointed Chair on March 5, 2010.

14. Alan Friedman, who appears to be a white male, in October 1999 was appointed by the joint leadership of the United States Congress to the Board of Directors of the Office of Compliance and has so served at all times relevant herein.

15. Roberta L. Holzwarth, who appears to be a white female, in May 2000 was appointed by the joint leadership of the United States Congress to the Board of Directors of the Office of Compliance and has so served at all times relevant herein.

16. Susan Robfogel, who appears to be a white female, in October 1999 was appointed by the joint leadership of the United States Congress to the Board of Directors of the Office of Compliance and has so served at all times relevant herein.

17. Barbara Childs Wallace, who appears to be a white female, October 1999 was appointed by the joint leadership of the United States Congress to the Board of Directors of the Office of Compliance and has so served at all times relevant herein.

18. Barbara J. Sapin, a white female, was appointed by the Board of Directors of the Office of Compliance to a five-year term as Executive Director of the Office of Compliance commencing January 2013. Previously, Ms. Sapin was appointed by the Board as Deputy Executive Director for the Senate in March 2008.

Complaint for Damages and
Equitable Relief                    Page 4 of 48                    Wigfall v Office of Compliance
                                                                    Case # TBD

19.    The Executive Director, presently Barbara J. Sapin, appoints persons to all OOC positions relevant herein other than two Deputy Executive Directors, the General Counsel and attorneys employed within the office of the General Counsel.

20.    Teresa James, a white female, is presently the Associate Director for Executive Programs of the OOC and at all times relevant herein until early 2016 was the direct supervisor of Plaintiff.  Until recently Ms. James held the position of Chief Resolution Officer.  Ms. James has been promoted to at least two other titles since June 2008 including Director of Dispute Resolution.

21.    John D. Uelmen, a white male, was in December 2015 appointed by the Board of Directors of the Office of Compliance as the General Counsel of the OOC.  Mr. Uelmen joined the Office of Compliance in April 2009 and previously held the positions of Senior Attorney, Acting General Counsel, Deputy General Counsel and Supervising Attorney.

22.    Peter Eveleth, a white male, was in April 2003 appointed by Susan Robfogel, then Chair of the Board of Directors of the Office of Compliance, as the General Counsel of the OOC.  Eveleth served as General Counsel from May 2003 until May 31, 2013.

23.    Amy Dunning, a white female, served as General Counsel from September 2013 until her retirement in October 2015.

24.    The General Counsel appoints all attorneys within the office of the General Counsel.

25.    The General Counsel supervises the OSH Program of the OOC.

26.    The General Counsel has at all times relevant herein been in the supervisory chain of Plaintiff.

27.    Hillary Benson, a white female, serves as an attorney in the office of the General Counsel and presently reports to John D. Uelmen.

Complaint for Damages and
Equitable Relief                              Page 5 of 48                  Wigfall v Office of Compliance
                                                                           Case # TBD

## IV.  WITNESSES AND OTHER PERSONS

28.     Jennifer McCuiston, an African-American female of lighter complexion than Plaintiff, presently holds the position of Administrative Officer at the OOC.  Ms. McCuiston previously held the position of Management Analyst/Counselor at the OOC.

29.     Tamara Chrisler, an African-American female who appears to be of lighter complexion than Plaintiff, served as Executive Director of the OOC from January 2008 until January 2013, and Acting Executive Director of the OOC from April 2006 to January 2008. Following the appointment of Barbara J. Sapin as Executive Director in January 2013, Ms. Chrisler remained in the employ of the OOC, possibly as an independent contractor, until October 2013.

30.     Richard Smith, who appears to be an African-American male, and also appears to be less than 40 years of age and of lighter complexion than Plaintiff, presently holds the position of Counselor at the OOC since his appointment in December 2015.  Mr. Smith was not previously employed by the OOC.

31.     Alexandria Sabatini, who appears to be a Caucasian female of less than 40 years of age, was initially a temporary employee who was later hired into the OOC position of Administrative Assistant.  Ms. Sabatini has since left the employee of the OOC.

32.     Marie Joseph, whom Plaintiff believes to female of Indian descent, was an employee of the OOC for several years concurrently with Plaintiff's employ.

33.     Sharita Daniels Obiora, who appears to be an African-American female, was an employee of the OOC for several years concurrently with Plaintiff's employ.

34.     Allan Holland, who appears to be an African-American male, was an employee of the OOC for several years concurrently with Plaintiff's employ.

Complaint for Damages and
Equitable Relief                                    Page 6 of 48                    Wigfall v Office of Compliance
                                                                                    Case # TBD

## V.  FACTUAL ALLEGATIONS

35.    Defendant OOC is an employer subject to: Title VII of the Civil Rights Act of 1964, the

Fair Labor Standards Act of 1938, the Rehabilitation Act of 1973, Title I of the

Americans with Disabilities Act of 1990, and the Age Discrimination in Employment Act

of 1967, as applied by the Congressional Accountability Act of 1995 (hereinafter "CAA"

or "the Act")

36.    Defendant OOC is an employer subject to the prohibition of intimidation or reprisal

contained within the CAA itself.

37.    During Plaintiff's employ with Defendant the majority of her supervisory chain, the three

persons who have served as the General Counsel, and indeed most members of

management, appeared to be Caucasian, and/or of white or very light skin color.   One

notable exception was Tamara Chrisler, an African-American female who served as

Executive Director of the OOC from January 2008 until January 2013, and Acting

Executive Director of the OOC from April 2006 to January 2008.

38.    In 2007 Plaintiff WIGFALL interviewed for a contract with the OOC.   During that

interview an inappropriate racial comment was made by then General Counsel Peter

Eveleth.

39.    During her first year as a contractor with the OOC Plaintiff sometimes noticed

discrimination and inappropriate behavior in the workplace. Plaintiff found this shocking

given the mission of the agency. However, as Plaintiff spent most of her work hours

inspecting outside of the OOC she found it was easier to ignore certain behaviors.

40.    Sometime in 2009 Sharita Daniels Obiora reported for the first time to the OOC health

and safety concerns about the Madison Building's Room LM-318 file archive room.

Complaint for Damages and
Equitable Relief                              Page 7 of 48                    Wigfall v Office of Compliance
                                                                              Case # TBD

41.   Ms. Daniels Obiora made several other reports of her concerns over the following years, and objective evidence of a health and safety issue in Madison Room LM-318 was observed by OOC management on several occasions.

42.   Despite Ms. Daniels Obiora's reports of concerns about health and safety issues in Madison Room LM-318 the OOC continued to expect her and others to work in that room and to handle materials which had been stored in that room.

43.   In early 2010 Plaintiff WIGFALL applied for the Occupational Safety and Health ("OSH") Program Manager position. Plaintiff advanced to the second round of interviews. However, at that interview Plaintiff was told that they had no questions for her. Plaintiff was never officially told that she did not get the position, but Plaintiff heard discussions about the OOC's selection up and down the halls.

44.   Several weeks later Plaintiff heard Assistant General Counsel Susan Green tell someone that the person selected for the position decided not to accept the job. Since no one had given Plaintiff WIGFALL any information she requested a meeting and was told that they did not have a qualified candidate.

45.   As Plaintiff knew she was qualified she contemplated filing a claim for discrimination and/or retaliation at that time because of the unprofessional manner in which the entire process was conducted. Plaintiff decided instead to meet with the Tamara Chrisler, then OOC Executive Director.  Plaintiff described the entire process to Chrisler and told her that Plaintiff felt she was being discriminated against and why.

46.   Approximately May 2010, a few weeks after Plaintiff's discussion with Ms. Chrisler, she was approached by General Counsel Peter Eveleth and Assistant General Counsel Susan Green and told that they had decided to create another job because they felt that there was

too much work for one person and that they thought Plaintiff was a better fit for the

Compliance Coordinator position which would manage the inspectors and the inspection

process and report to the yet-to-be-hired OSH Program Manager.

47.     Plaintiff accepted the position and duties as the Compliance Coordinator and started

immediately.

48.     After the OOC described Plaintiff's specific duties as Compliance Coordinator Plaintiff

told the OOC that "coordinator" was an inappropriate title. After some discussion the

OOC change the title to Compliance Manager.

49.     According to the OOC Plaintiff's new position was a promotion but, unfortunately,

Plaintiff was required to remain a contractor because they had no full time employee

("FTE") slots available.

50.     Plaintiff's new position was not officially announced until August 12, 2010, several

months after accepting it.

51.     Later Executive Director Tamara Chrisler met with Plaintiff and stated that she had

concerns about the way things were handled. Thereafter Ms. Chrisler told management in

the General Counsel's Office that they needed to fix it.

52.     In August 2010 the General Counsel recruited and hired Faith Perry, a white female, as

OSH Program Manager.  Plaintiff trained Ms. Perry who often commented on the fact

that Plaintiff should have been in her job.  From their discussions it was clear to both

Plaintiff and Ms. Perry that Plaintiff had the skills to do the job but General Counsel

Eveleth did not want Plaintiff in that high profile position.

53.     On April 22, 2012, Plaintiff finally became a directly hired federal employee.

54.     On March 10, 2013, Plaintiff finally became the OSH Program Manager after Faith Perry

resigned and recommended Plaintiff for the position. Initially the General Counsel discussed offering Plaintiff the position as "acting". Plaintiff stated that he would either give Plaintiff the position or not because Plaintiff had "acted" long enough. The General Counsel relented and offered to put Plaintiff into the actual position rather than "acting".

55.     Plaintiff was told by General Counsel Peter Eveleth, and Barbara J. Sapin agreed, that with the next budget increase Plaintiff would be able to hire a replacement for the position Plaintiff was vacating to become OSH Program Manager. In order to attempt to get the work done during the interim Plaintiff worked a great deal of unpaid overtime or "comp time".

56.     Plaintiff is informed and believes and thereon alleges that she was never paid for overtime.

57.     Plaintiff is informed and believes and thereon alleges that the OOC has improperly classified her as an "Exempt" employee.  Plaintiff does not believe that her position, as it has actually been managed by the OOC, qualifies for "exempt" status and, therefore, the OOC owes Plaintiff overtime pay for each and every hour of "comp time" Plaintiff has accumulated during her employ with OOC.

58.     Summer 2013:  During the interview process to replace Peter Eveleth as General Counsel of the OOC, Sharita Daniels Obiora told the Executive Director, Barbara J. Sapin, that several minority staff members and women felt discriminated against by John D. Uelmen. Mr. Uelmen was the candidate that Ms. Sapin preferred and her response to Ms. Daniels Obiora was not positive.  Ms. Daniels Obiora told her that all of the minorities to whom she was referring came to the same conclusion independently of each other and that they never would have known what each other thought about Mr. Uelmen had there not been

Complaint for Damages and
Equitable Relief                                    Page 10 of 48                    Wigfall v Office of Compliance
Case # TBD

the Office of General Counsel interview process. Ms. Daniels Obiora also informed Ms. Sapin that most of the other OOC employees were afraid to speak up.  Ms. Sapin appeared to discount Ms. Daniels Obiora's statements.

59.     When the Board of Directors gave staff an opportunity to evaluate the General Counsel candidates Ms. Daniels Obiora then told the Board of Directors that she and several other minority members of staff felt that Uelmen had a problem with minorities and women.

60.     The Board of Directors was shortly thereafter informed by Plaintiff WIGFALL, Marie Joseph, and other OOC employees of their concerns that John D. Uelmen engaged in discriminatory behavior based at least upon race, skin color and gender.

61.     Mr. Uelmen was not appointed to the General Counsel position at the conclusion of the process in 2013.

62.     Amy Dunning was appointed to the General Counsel position in September 2013.

63.     In 2014 Plaintiff began having issues with her health. Barbara J. Sapin asked about Plaintiff cutting back working so much comp time. Plaintiff told Sapin that she had already planned to cut back because working so much was impacting her health but Plaintiff needed the OOC to fill Plaintiff's prior position as has been planned and promised. Executive Director Barbara J. Sapin told Plaintiff that there was no position. The FTE had been given to another area in OOC and Plaintiff would just have to figure out how to get all of the work done.

64.     In approximately June – July 2015, John D. Uelmen began informally acting as General Counsel when General Counsel Amy Dunning was out of the office on leave until her retirement.  Mr. Uelmen was later officially made Acting General Counsel, presumably so that management could ease him into the General Counsel position.

Complaint for Damages and
Equitable Relief                                  Page 11 of 48                    Wigfall v Office of Compliance
                                                                                   Case # TBD

65. On or about August 14, 2015, Ms. Daniels Obiora worked in the Madison Building LM-318 file archive room. Ms. Daniels Obiora became very concerned about the long-standing health and safety issue in LM-318 about which she had frequently reported to the OOC.

66. On or about August 17, 2015, Ms. Daniels Obiora told Teresa James and Deputy Executive Director for the Senate, Woody Anglade, about her most recent experience in Madison Room LM-318. Ms. Daniels Obiora requested that the OOC find another way to handle the archived files in that room the health and safety issue had become worse. James and Anglade asked Ms. Daniels Obiora a few questions and then told her that they would set up a meeting with Ms. Daniels Obiora to discuss her concerns.

67. On or about August 18, 2015, Ms. Daniels Obiora met with Teresa James and Woody Anglade. After they asked more questions Ms. James made the comment that it obviously was not mold issue because mold. Mr. Anglade said something to the effect of, "Let's not make medical conclusions."

68. On or about August 24, 2015, Ms. Daniels Obiora had an unscheduled meeting with Teresa James and Woody Anglade. Mr. Anglade said that there are workers compensation forms online that Ms. Daniels Obiora could file, if desired. Plaintiff said that her intention was not to get time off with pay but rather to not have to go back into Madison Room LM-318.

69. Ms. James then said, "…you can just wear gloves and long sleeves and then you're okay to go back in there." Ms. Daniels Obiora said she was not comfortable with.

70. Ms. Daniels Obiora also stated that at least one other OOC employee had breathing issues coinciding with working in Madison Room LM-318.

Complaint for Damages and
Equitable Relief                    Page 12 of 48                    Wigfall v Office of Compliance
Case # TBD

71.     Mr. Anglade asked what Ms. Daniels Obiora's plan was for how to handle the files. Ms. Daniels Obiora offered to continue to box up files and prepare them for archival, but somebody else would have to take it from there. Plaintiff said that she didn't have a plan that says "It must be done this way" because she was aware that other people would be affected and would have to have input in a decision.

72.     On or about August 24, 2015, Ms. Daniels Obiora approached Barbara J. Sapin to obtain her signature on a letter.  Ms. Sapin apologized for having missed the letter when Ms. Daniels Obiora gave it to her earlier. Ms. Daniels Obiora told Ms. Sapin that it was not a problem and "that is the least of my worries".  Ms. Sapin said, "I hope this office doesn't give you worries." Ms. Daniels Obiora replied, "Then you need to tell your managers to stop tripping."  Ms. Daniels Obiora then explained that she had just had a meeting with Teresa and Woody about the Madison Room LM-318 the file room but they were not responsive. Ms. Sapin said she thought they were working something out with John D. Uelmen.  Ms. Daniels Obiora said "I don't know anything about them working with John but I know I was told that if I wear gloves and long sleeves that I could go back in there." Ms. Sapin asked who told her that; she replied that it was Teresa James.  Ms. Sapin asked when did Ms. Daniels Obiora have to go back into the room. Ms. Daniels Obiora replied that she "wasn't going back unless I had a full hazmat suit and training on how to use it properly".  Ms. Sapin nodded and said "okay."

73.     Thereafter Ms. Daniels Obiora saw no indication that anything was being done to address her concerns about the file room, Madison Room LM-318.

74.     On August 26, 2015, after years of requests that some action be taken about the situation, Ms. Daniels Obiora filed a formal request for a safety and health inspection of the OOC

Complaint for Damages and
Equitable Relief                              Page 13 of 48                    Wigfall v Office of Compliance
Case # TBD

file room - Madison Room LM-318 pursuant to Part C, Section 215 of the Congressional

Accountability Act of 1995.

75.    On August 26, 2015, Executive Director Barbara J. Sapin was notified of Ms. Daniels

Obiora's request for inspection.

76.    On September 28, 2015, Ms. Daniels Obiora was notified of the mold types found in

Madison Room LM-318 (smuts, periconia, and myxomycetes).  Ms. Daniels Obiora was

informed that the sampling machines only obtained a partial reading because of

mechanical failure and that the inspectors testing the room would try to get approval to

sample again to get more complete readings.

77.    Since Ms. Daniels Obiora's request on August 26, 2015, for a safety and health

inspection Executive Director Sapin and General Counsel Uelmen have made statements

to the effect that they did not believe the safety and health inspection should result in

reporting findings of unsafe or unhealthy conditions present in Madison Room LM-318.

78.    Ms. Sapin explicitly stated on at least one occasion that the actual presence of

mold/mildew in Madison Room LM-318 should not result in a finding in a report of the

inspection.  Plaintiff is informed and believes and thereon alleges that such an omission

of findings would violate OOC policy and/or past practice of the OOC in inspecting other

workplaces of Congress and its Agencies / Instrumentalities.

79.    Plaintiff WIGFALL on more than one occasion has stated that there were health and

safety findings in Madison Room LM-318 and those findings would be reported as would

such findings in any other location in the Capitol Complex used or controlled by any

other Congressional agency.  Sapin and Uelmen appeared distressed and/or annoyed with

Plaintiff when Plaintiff made such statements.

Complaint for Damages and
Equitable Relief
Page 14 of 48
Wigfall v Office of Compliance
Case # TBD

80.    Approximately a few months prior Plaintiff's receipt of the negative Performance Evaluation in October 2015 Plaintiff drafted a report containing findings of health and safety issues in each of three OSH cases filed by investigators employed by the Architect of the Capitol's ("AOC's") Inspector General's office.

81.    Apparently Kevin Mulshine, the Inspector General for the AOC, had the three investigators turn in their weapons.  Despite claims to the contrary, Plaintiff's report of findings concluded that the modified job duties for each of the de-armed investigators still subjected them to serious risks of harm and that the weapons should be returned to the investigators or their job duties must be further amended to avoid the risks of harm.

82.    Thereafter OOC General Counsel Amy Dunning met with Plaintiff and Hillary Benson. In that meeting Dunning informed Plaintiff that Dunning planned to strip from the report Plaintiff's findings, leaving the report to state there were no findings.   Plaintiff strenuously objected to Dunning's plan and thereafter documented her objections in writing to Dunning.

83.    Plaintiff viewed Dunning's plan, which was implemented by Dunning, as an unlawful violation of the rights of the three investigators to a healthy and safe workplace under the CAA.

84.    Plaintiff is informed and believes and thereon alleges that Kevin Mulshine and Barbara J. Sapin are friends and have connections with each other outside of their respective current employment.

85.    On October 28, 2015, Plaintiff received via email a negative Performance Evaluation ostensibly written by General Counsel Amy Dunning.   Dunning had been taking extensive leave since approximately mid-2015 and retired shortly after the Evaluation

was sent to Plaintiff.

86.   The October 2015 Performance Evaluation was the only negative evaluation Plaintiff received in her then twenty-eight years in the Occupational Safety and Health field.

87.   On December 15, 2015, Plaintiff provided the OOC with a rebuttal to the negative Performance Evaluation.  The Rebuttal noted multiple misrepresentations and omissions of facts in the Evaluation.  The Rebuttal also noted the shortage of personnel to complete the work including Plaintiff's prior position had not been filled, a shortage that had by the time of the October 2015 Evaluation existed for years.

88.   On or about December 11, 2015, Ms. Daniels Obiora was notified that results were back from the second sampling of Madison Room LM-318 with findings several types of mold: ascospores, basidiospores, cladosporium, hyphal elements, penicillium/aspergillus group, smuts, periconia, myxomycetes, and an unknown type of spore.

89.   Effective December 14, 2015, the Board of Directors of the OOC appointed Mr. Uelmen to General Counsel.

90.   As the years have progressed there have been serious issues dealing with the OOC work environment that has become extremely toxic. During the first few years there were incidents that occurred where harassment, racism and discrimination were displayed. However, during those times the former Executive Director, Tamara Chrisler, seemed willing to address them as much as she could when she was made aware of them. Chrisler was somewhat limited in her ability to do so because the discriminatory activities were often covert. The former Executive Director was an African American female and had to contend with her own discrimination issues with the staff that worked for the OOC.

91.   Plaintiff for much of her employment was one of only two minorities employed within

the General Counsel's "side" of the OOC.

92.     Plaintiff heard negative comments made about former Executive Director Tamara

Chrisler by former General Counsel Peter Eveleth, Asst. General Counsel Susan Green

and current General Counsel John D. Uelmen. As Ms. Chrisler was very professional, fair

and equitable Plaintiff believed the negative statements were motived by racism, colorism

and sexism. Even though Plaintiff dealt with several discriminatory incidents Ms.

Chrisler's tenure Plaintiff tended to only bring the worst issues to her.

93.     In spite of the discriminatory atmosphere that existed Plaintiff had received two

promotions so Plaintiff persevered in her position. While Faith Perry, former OSH

Program Manager, was there she provided a buffer between Plaintiff and some of the

discriminatory incidents that occurred.

94.     Things changed for the worse when Barbara J. Sapin became the new Executive Director

of the OOC. The racism, intolerance, and discrimination became more overt since Sapin

became Executive Director.

95.     Several employees have brought issues and concerns about the work environment to

Sapin's attention multiple times. Sapin tends to make excuses and blames the behaviors

on personalities of the individuals. Her failure to address issues that have been conveyed

to her has resulted in a work environment that is hostile, unhealthy and the morale of the

agency is now extremely low, particularly among employees who have spent years there

and have endured the hostile environment over time.

96.     John D. Uelmen has regularly engaged in rude and inappropriate behavior towards

Plaintiff including, but not limited to, regularly interrupting Plaintiff while

presenting/reporting information at meetings.  Uelmen has engaged in similar behavior

towards other non-white women however non-white women very rarely have occasion to present information in same meeting therefore Plaintiff appears to have borne the brunt of Uelmen's discriminatory behavior.  Uelmen does not engage in the same behaviors when white males and white females are presenting information/talking in meetings.

97.   Attorney Hillary Benson has engaged in similar rude and inappropriate behavior towards Plaintiff.

98.   Plaintiff is the only Manager in the OOC who has regularly been excluded from Management Staff Meetings.

99.   Plaintiff has been the only non-white female to hold a Management position during the relevant period herein this Complaint.

100.  Plaintiff has resisted and/or complained to management about the OOC's differing treatment of employees based upon retaliatory and/or discriminatory motives prohibited by the CAA.

101.  Plaintiff has resisted and/or complained to management about the OOC requiring Plaintiff to treat employees she supervises and who are members of protected classes differently from those who are not members of the same protected classes.

102.  Plaintiff has resisted and/or complained about attempts by the OOC to violate OOC employees' rights to a safe and healthy workplace through concealment of and/or requiring exposure to dangerous or potentially dangerous conditions in the workplace.

103.  Plaintiff is informed and believes and thereon alleges that she has been denied bonuses and increases in pay for promotions by the OOC and that such denials are based upon retaliatory and/or discriminatory motives prohibited by the CAA.

104.  Plaintiff is informed and believes and thereon alleges that she has been denied bonuses by

the OOC and that such denials are based upon retaliatory and/or discriminatory motives prohibited by the CAA.

105.    Plaintiff is informed and believes and thereon alleges that she has for years been denied a FTE by the OOC to fill the position Plaintiff vacated upon her promotion and that such denials are based upon retaliatory and/or discriminatory motives prohibited by the CAA.

106.    In early 2016 Attorney Hillary Benson began applying mosquito repellant while in the OOC offices.  Initially, and for most of the relevant period, Benson's desk was adjacent to Plaintiff's, separated only by a fabric-lined cubicle partition wall.

107.    Plaintiff was not immediately aware that Benson was the source of the vapors and Plaintiff's physical reactions.

108.    Plaintiff immediately began having significant negative, physical reactions to the repellant that materially impacted her ability to perform her duties.

109.    On or about March 25, 2016, Plaintiff discovered that Benson was the source of the repellant vapors.  Plaintiff had heard Benson spraying the repellant while Benson was in her cubicle.  Plaintiff spoke to Benson by phone to discuss the repellant issue but Benson was very rude and condescending to Plaintiff.  Benson thereafter showed the spray can of repellant to Plaintiff and explained that she was pregnant and needed to wear the insect repellant to avoid catching the Zika virus.

110.    Plaintiff informally approached OOC management, including Uelmen, about her reactions to the repellant but was met with dismissal and ridicule.  Uelmen clearly had prejudged the situation and assumed Hillary Benson, the white female, was honest in her description of her use of the product, which Plaintiff denies is true.  Uelmen also took the position that he could do nothing about the situation.  Adding insult to injury, Uelmen

Complaint for Damages and
Equitable Relief                              Page 19 of 48                    Wigfall v Office of Compliance
                                                                                                    Case # TBD

took the position that Plaintiff's symptoms, if real, were the result of some other factor unrelated to the workplace. Uelmen stated that he believed Plaintiff's symptoms were merely the result of seasonal allergies.

111. Plaintiff is informed and believes and thereon alleges that John D. Uelmen is neither a medical expert nor an occupational health and safety expert as is Plaintiff.

112. Plaintiff has missed numerous days of work as result of the repellant use by Hillary Benson and the OOC's failure to reasonably accommodate Plaintiff.

113. Plaintiff was effectively driven out of her workspace for a significant period due to the repellant that had contaminated Plaintiff's workspace. Plaintiff, when working in the OOC office, was required to resort to using empty conference rooms in order to work.

114. On March 31, 2016, Plaintiff had a meeting with the OOC Counselor, Richard Smith, about Hillary Benson's use of the insect repellent and how it was impacting Plaintiff's health. Smith suggested that Plaintiff meet with his Manager, Woody Anglade, Deputy Director for the Senate. Plaintiff met with Anglade who told Plaintiff that we should be able to work out something so that Benson and Plaintiff were both safe. He said that he would speak with John D. Uelmen. Plaintiff made it clear to Anglade that the situation was making her sick.

115. On April 5, 2016, Plaintiff was having a one on one meeting with her employee, Sara Hoover. Hillary Benson again rudely interrupted the meeting to ask about something that she wanted.

116. Later on April 5, 2016, Plaintiff became very ill while in her office and had difficulty breathing. Plaintiff could smell the insect repellent so Plaintiff went into Hillary's office, picked up the bottle, took a picture and put it on the copier to make a picture. Plaintiff

Complaint for Damages and
Equitable Relief                                    Page 20 of 48                    Wigfall v Office of Compliance
Case # TBD

then looked up the Safety Data Sheet and read about the Health related issues. Plaintiff spoke with Woody Anglade again about her health concerns.  He let Plaintiff know that he had spoken with Uelmen as he had told Plaintiff that he would do before.

117.    On April 6, 2016, Plaintiff met with John D. Uelmen regarding Hillary Benson and the insect repellent. Uelmen said that he was already aware about the situation because Hillary told him that Plaintiff was complaining. Uelmen said that Plaintiff needed to understand that this was an issue for Hillary's baby. Plaintiff told Uelmen that while she understood this was also a Safety and Health issue for others and as well as herself. Uelmen said that Benson's doctor had said this is what needed to happen. Plaintiff told Uelmen that Benson should be able to apply her insect repellant down at the front door before going outside. There was no need for her to use a hazardous chemical inside the workplace and impact others. Uelmen said that Benson told him that only Plaintiff had complained about the chemical and that the insect repellent wasn't being sprayed and so was not an issue. Plaintiff told Uelmen that was not true. Plaintiff said it is not the spraying alone that was a problem; the chemical itself that is still a problem. It didn't seem to matter what Plaintiff said, Uelmen sided with Benson and said that there was nothing that he could do since she told him that she wasn't using the chemical indoors. Uelmen said that he told Benson to use one restroom or the restroom in the hallway and spray before she left. Uelmen, apparently giving no weight whatsoever to Plaintiff's statements, said that he had no reason to believe that Benson wasn't doing this. Plaintiff told Uelmen that Benson clearly was using the repellant before she went home as well as during the day. Even though Benson was no longer spraying the insect repellent indoors as if it was an air freshener Plaintiff told Uelmen the chemical was still present and she

was still reacting to it.

118.     On April 11, 2016. Plaintiff had another meeting with Uelmen regarding the Insect Repellent. Plaintiff told Uelmen that she now had bronchitis because of the chemical. Uelmen said "I know that you believe this is what is happening, but we don't agree." Uelmen said that Benson was no longer spraying the chemical. Plaintiff told Uelmen again that the spray was not the issue but rather Plaintiff was reacting to the presence of the chemical. Uelmen spoke again about Benson's rights under the Americans' With Disabilities Act ("ADA").  This was particularly disturbing to Plaintiff both because of Uelmen's utter lack of concern for Plaintiff's rights under the ADA, whose basic life function of breathing was seriously hampered by off-label use of a chemical in the workplace in violation of federal law, and because the use of insect repellent is not a reasonable accommodation of any disability Benson may have had as pregnant employee that would allow her to perform her essential job duties.

119.     On April 14th and 15, 2016, Plaintiff took sick leave due to repellant related illness and also to keep a doctor's appointment regarding the exposure to the insect repellent. Uelmen was pushing OSH for the report on the case regarding the OOC's file room, Madison Room LM-318.  Shonda Perkins had worked on the report and Plaintiff asked her to send it to Plaintiff on April 14 for final review.  Plaintiff and Ms. Perkins had promised to have it completed by April 14.  Plaintiff, who was out sick and at home, went to sleep not feeling well and missed Ms. Perkins sending the document.  Plaintiff woke up after 5:00 P.M. and sent it.  As it turned out Plaintiff had sent the wrong version of the report. Ms. Perkins sent the correct report to Hillary Benson on the morning of the April 15, 2016.

Complaint for Damages and
Equitable Relief                    Page 22 of 48            Wigfall v Office of Compliance
Case # TBD

120.    On April 18, 2016, during the General Counsel Staff meeting Uelmen told Plaintiff that he wanted to speak with her following the meeting. Uelmen and Plaintiff met and the first thing Uelmen did was bring up case 2015-08, the Madison Room LM-318.  Uelmen was very aggressive, nasty and angry.  He said that Sharita Daniels Obiora had documents that he had not seen.

121.    Uelmen said that everyone before Plaintiff had completed all cases within 60 days. Plaintiff told Uelmen that was not true. He said that since the case meeting in February case 2015-08 should have been completed. Plaintiff reminded Uelmen that Plaintiff had missed almost 3 weeks of work; that the specialist who was working the case had also been out sick; and the specialist had spent time covering inspections for other specialists who had been out due to illness. Plaintiff reminded Uelmen, again, that OSH does not have enough people; therefore when people get sick we get behind in other areas. Uelmen said that OSH was "over thinking the reports and the findings" and that some of them "just didn't make sense." Uelmen said that he would be sending Plaintiff something in writing about his expectations. Plaintiff sent Uelmen an email summarizing the meeting.

122.    On April 20, 2016, Uelmen sent Plaintiff a memorandum ostensibly to express his expectations as noted in their April 18, 2016, meeting.  The memorandum went further than their discussion.   Uelmen made multiple accusations regarding Plaintiff's performance of duties.  The accusations were not well founded and ignored significant facts that tended to disprove Uelmen's negative accusations regarding Plaintiff's performance.  Notably among the cases listed by Uelmen is the Madison Room LM-318 case, identified merely in the memorandum as "OSH 2015-03" (which is incorrect;

Complaint for Damages and
Equitable Relief                    Page 23 of 48              Wigfall v Office of Compliance
                                                              Case # TBD

correct designation is OSH Case 2015-08).  Of all the cases listed by Uelmen in this Memorandum the Madison Room LM-318 is the only case for which Uelmen provides no description despite devoting a large portion of the Memorandum to this case.

123.   On April 20, 2016, Plaintiff met again with Woody Anglade about the insect repellent. Plaintiff told him that she had gone to Uelmen but that the situation was still happening and Plaintiff was still getting sick.  Plaintiff told Anglage about the chemical, the safety data sheet and the danger of the chemical, including the fact that Hillary Benson had been using the repellant not according to the label which itself was a violation of federal law. Anglade was apologetic and documented the meeting as he appeared to have had done in prior meetings.

124.   Plaintiff is informed and believes and thereon alleges that Uelmen drafted the April 20, 2016, Memorandum in retaliation for Plaintiff having defied him and Sapin by issuing a report of the findings of an unhealthy and/or unsafe work environment within the OOC itself.

125.   General Counsel Uelmen, in response to Plaintiff's report of findings of an unhealthy and/or unsafe work environment within the OOC in Madison Room LM-318, implemented additional changes whereby such reports would be subject to much more revision by attorney's working directly for the General Counsel.  Said attorneys are generally not qualified to determine the existence of OSH findings.

126.   Plaintiff's report of findings in Madison Room LM-318 appears to have disappeared in Uelmen's new process.  Plaintiff has had no more involvement with it and, to Plaintiff's knowledge, Uelmen and his legal staff are simply not processing the report.

127.   On April 25, 2016, during the General Counsel Staff meeting John D. Uelmen made a

comment about people working in private and sneaking around. Plaintiff believes that this comment was made because of her working in conference rooms (which Plaintiff did to avoid the chemical contamination around her designated work area) and working on cases in those rooms sometimes with several of her employees. Uelmen never asked Plaintiff why she was working in conference rooms.

128.    On April 25, 2016, Plaintiff filed her first Request for Counseling with the OOC.  This is the first official, required dispute resolution step in the administrative process under the CAA.

129.    The CAA and OOC policy require a Request for Counseling to be kept confidential.  The Employing Office is not to be informed of the filing.

130.    Plaintiff is informed and believes and thereon alleges that the OOC was not successful in keeping the existence and contents of Plaintiff's first Request for Counseling from John D. Uelmen and/or Barbara Sapin.

131.    On May 2, 2016, at the General Counsel Staff meeting, we usually are asked to report what we are working on for the upcoming week.  Plaintiff usually reports out for the entire OSH team.  Uelmen permitted everyone besides Plaintiff to report out updates and then proceeded to close the meeting. Plaintiff asked Uelmen if he was interested in hearing what the OSH Team would be working on. Uelmen, once again displaying his frequent behavior of ignoring Plaintiff in the face of direct questions, did not respond but Plaintiff proceeded to tell him the things that we were working on.

132.    In most General Counsel staff meetings John D. Uelmen tends to direct the Management questions to Brent Dittman even though Plaintiff is the Manager. Plaintiff usually allows Dittman try to answer and then either adds to Dittman's answers or ends up answering

the question in toto.   Plaintiff believes that Uelmen does this deliberately to usurp Plaintiff's authority in front of Plaintiff's staff.

133.   Prior to May 4, 2016, Plaintiff had exchanged emails and had meetings with John D. Uelmen regarding the issues Plaintiff was having with her reaction to the 'Deep Woods OFF' insect repellant that Hillary Benson was wearing.   Plaintiff had made it a point to sit as far away from Benson as possible in meetings when we were both required to be in the same room.   Plaintiff had avoided meeting with Benson in the small conference room. Planitff had been very clear with Uelmen that she was still reacting to what Benson was wearing.

134.   On May 4, 2016, Plaintiff, Uelmen and Benson had a meeting scheduled. Plaintiff sat in the opposite end of the conference room from Uelmen, on the side with ventilation. When Hillary Benson entered the room she passed empty seats, coming far closer to wear Plaintiff was sitting than was necessary. Plaintiff believes that Hillary Benson did this intentionally because she knew that Plaintiff was reacting to the chemical that she was wearing. Benson appeared to think that it was funny. Uelmen was in the conference room but said nothing to Benson. Plaintiff started reacting to the chemical and got out of the room as soon as she could but not before she was coughing and having trouble breathing.

135.   On May 11, 2016, Plaintiff sent Uelmen an email telling him that although they had moved Hillary Benson Plaintiff was still having problems with the chemical. Plaintiff explained why she thought it was still an issue and told Uelmen that she was being forced to work away from her desk. Uelmen failed to respond which was typical of him when Plaintiff would send Uelmen emails.   Plaintiff is informed and believes and thereon alleges that the chemical contamination was intentionally not remediated because both

Hillary Benson and John D. Uelmen, as well as others in the OOC, knew the chemical was making Plaintiff ill, they knew or should have known the chemical was affecting other employees in the OOC, and they knew Plaintiff by this time had already missed approximately two weeks of work due to such illness.

136.   Hillary Benson was promoted during this time and was moved to another office away from Plaintiff.  Benson's move was coincidence, not accommodation of Plaintiff.

137.   On May 18, 2016, Plaintiff worked in a conference room again because of the pesticide.

138.   On May 18, 2016, a meeting including another employing office under the CAA had been scheduled to discuss a case. Plaintiff came into the meeting and again sat at the end near ventilation.  Hillary Benson came into the conference room and sat on the other side but still close enough to irritate Plaintiff's breathing. Benson again passed several empty chairs in which she could have sat further away from Plaintiff. Plaintiff struggled through the meeting. Architect of the Capitol ("AOC") Safety Director Sue Adams and her Certified Industrial Hygienist ("CIH") Tim Paz were in the meeting along with the OOC contract CIH, Mark McGowan.  Plaintiff had already spoken to Mark McGowan about the situation with the cubical panels around Plaintiff's work area and he confirmed what Plaintiff already suspected regarding the 'off gassing' from the insect repellant.

139.   Immediately after the meeting Sue Adams stopped to speak with Plaintiff. Adams asked Plaintiff if she was "OK" and Plaintiff told her no. Adams asked if there was anything that she could help with. At first Plaintiff said no but then said yes, maybe. Plaintiff waited until everyone left the room and then explained to Adams and Paz about Plaintiff's issue with the Deep Woods OFF insect repellant and asked their professional opinions. Plaintiff told them that it was a "touchy subject." They asked if they could

come to Plaintiff's office so Plaintiff escorted them to it.

140.   As soon as Sue Adams walked in she said that she couldn't believe that Plaintiff could work in there. She could smell it as soon as she entered Plaintiff's office.  Tim Paz confirmed what Mark McGowan and Plaintiff already knew about the chemical in the fabric 'off-gassing'. Sue Adams offered to go to the Library of Congress Superintendent's office to borrow a clean air machine; the OOC is physically located the John Adams Building, part of the Library of Congress.  Plaintiff explained that she had been told that the panels could not be moved because of the cost. Fifteen minutes later the Assistant Superintendent arrived at the OOC and asked for Plaintiff who quietly explained to him what was going on and told him it was a "touchy subject." He asked to see the area. He also had someone from one of his shops with him. Plaintiff took them back to her office. They looked at what they thought could be done to switch out the panels. They thought that it could be done and they seemed willing to help. They left and came back thirty minutes later with another shop who looked at taking the panels loose. They told Plaintiff that they could start work the next day.

141.   At this point Plaintiff thought that she needed to talk to someone in the OOC. Plaintiff went looking for the Executive Director, Barbara Sapin, who was not in her office. John D. Uelmen was out of the office on vacation.  Plaintiff also looked for the Office Administrator, Jennifer McCuiston, who had been previously attempted to help with this issue. She was not available. Plaintiff had another meeting so went into it.

142.   As Plaintiff came out of the meeting she saw Hillary Benson leaving Barbara J. Sapin's office. Plaintiff put her head in the doorway and asked to speak with Sapin. Before Plaintiff could broach the subject Sapin began yelling about bringing the AOC into her

office without checking with her first. She accused Plaintiff of failing to communicate that Plaintiff was having a problem with the chemical. Plaintiff told Sapin that Sapin was well aware of the problem and that Plaintiff knew that Sapin had been informed by more than one person. Plaintiff told Sapin that she had told John D. Uelmen, what little OOC had done so far had not worked and Uelmen failed to respond. Sapin said that they were going to "resolve the issue." Plaintiff told Sapin that this had been going on since March and nothing had been done to resolve the issue. Plaintiff reminded Sapin that she was copied on Plaintiff's request for a reasonable accommodation. Plaintiff told Sapin that Hillary Benson had created a hostile work environment and that OOC management had failed to address a health and safety issue. Sapin got up, and slammed her door open against the wall and said take me down to your area and show me what they are planning to do.

143.   Plaintiff escorted Sapin who was still loudly making a fuss at Plaintiff for others to hear as they walked down the hall. When they arrived at Plaintiff's office she explained to Sapin the issues and what the AOC wanted to do. Plaintiff asked Sapin if she wanted Plaintiff to tell the AOC not to do the work and Sapin said no.

144.   On May 23, 2016, in the General Counsel staff meeting Uelmen stated that there would be a spring-cleaning to include panels and floors. Uelmen claimed that this has needed to happen for some time. Plaintiff is unaware of any "spring cleaning" having ever occurred in the OOC.

145.   John Uelmen asked Plaintiff what her thoughts were. Plaintiff told him that he should check with the AOC about their panels because there might be issues putting fluid on them. He told Plaintiff that "professionals would know how to do this."  "How hard could

it be?" Plaintiff told him that AOC had already looked at the panels and said that too much fluid on the panels could cause mold. He said this is no different from cleaning carpet in a person's home. Plaintiff did not comment on Uelmen's view of the matter nor his dismissal of concerns expressed by the AOC about creating additional safety hazards within the OOC.

146.    Following the General Counsel staff meeting Uelmen asked to meet with Plaintiff. He talked about the AOC coming to the office. Said that he was blindsided and that this was just another example of Plaintiff's failure to communicate.  Plaintiff told him that she sent him an email that he did not respond. He said that he gets lots of emails and was told that this was being handled. He hates getting blindsided. Plaintiff had no right to bring the AOC in. He said that Plaintiff thinks that the DEET is making her sick but Plaintiff had no proof of that and that Plaintiff owed Hillary Benson an explanation and an apology.   Uelmen claimed that Jennifer McCuiston was responsible for resolving the repellant issue. Plaintiff told Uelmen that the situation was not resolved. Plaintiff told Uelmen that Plaintiff was aware that Barbara J. Sapin had told Jennifer McCuiston that McCuiston should "stay out of this." Plaintiff told Uelmen that there seemed to be no plans to resolve this issue and that it looked like she had to do it herself or suffer in silence. Plaintiff told Uelmen that she had given him time to address the issue and that she was tired of being sick and unable to work in her office.

147.    On May 24, 2016, Hillary Benson updated the OSH case status report. When Plaintiff reviewed it she sent Benson an email dated 5/24/2016 requesting that her report be corrected because it misrepresented the status of OSH work. There were several cases that had been sent to Benson but Benson showed them being either with Plaintiff or OSH

Complaint for Damages and
Equitable Relief                    Page 30 of 48           Wigfall v Office of Compliance
                                                             Case # TBD

staff.  Benson apparently desired to create a false impression that Plaintiff had not turned over work to Benson.  Benson did not respond to Plaintiff's email but instead waited until the case status meeting to say that "it wasn't a big deal" and that "the report doesn't always reflect where work is in the process." Plaintiff stated that she did not agree and asked that the report be updated.

148.   May 25, 2016, the AOC shop personnel started moving the panels for Plaintiff's work area. Barbara J. Sapin came down saying that she wanted to see what was going on. Plaintiff heard Jennifer McCuiston tell Sapin you don't have to get up on the panels to smell them because the smell is pretty strong.  The project was finished on May 26 and Plaintiff was finally able to work in her office for the first time in weeks.

149.   On May 31, 2016, Plaintiff met with John to discuss Sara Hoover's personnel issue with late time. Uelmen told Plaintiff to write Hoover up because she was technically "AWOL" according to federal policy.

150.   On June 3, 2016, Plaintiff met again with Uelmen after Plaintiff had prepared paperwork for Sara Hoover.  Uelmen said that Plaintiff (her supervisor) could not issue a write up for Sara Hoover (a white female). Uelmen stated that he just wanted to meet with Hoover and document the meeting. He said that we couldn't afford to have her late but maybe Plaintiff did not make her feel valued as an employee. Plaintiff told him that was not true that Sara Hoover knew that she was valued as an employee and that Plaintiff had tried everything to help her and to find out why Hoover was chronically late. Plaintiff also let Uelmen know that complaints about Sara's attendance were coming from all team members as well as other employing offices because of how it negatively impacts inspections.

Complaint for Damages and
Equitable Relief                                Page 31 of 48                    Wigfall v Office of Compliance
Case # TBD

151. Thereafter on June 3, 2016, Uelmen and Plaintiff then met with Sara. Uelmen informed Hoover in front of Plaintiff that he highly valued her as an employee and wasn't sure that she felt that way. Uelmen told her that he was making plans for changing the OSH program and that he wanted her to know that she would be an intricate part of that process. Uelmen then asked her why she was late and she blamed Plaintiff for changing her shift. Plaintiff pointed out that Plaintiff had allowed Hoover to change her shift four (4) times but she was late no matter regardless.

152. Plaintiff was shocked at how the meeting had turned and felt like Uelmen allowed, if not encouraged, Hoover to turn the meeting into an opportunity to fax blame on Plaintiff.

153. Hoover then expressed concern about the look on Plaintiff's face. Plaintiff told Hoover that the look on her face was disbelief that Hoover had tried to make Plaintiff the issue after Plaintiff had tried to help her.

154. Uelmen then told Hoover that he was going to document the meeting. Uelmen took most of Plaintiff's write up, put it into a document "from him" and had Plaintiff give it to Hoover.

155. Sara Hoover is still late nearly every day and nothing is being done. Plaintiff's team is getting upset and this is creating discord. Plaintiff is informed and believes and thereon alleges that this is being done intentionally to harass and/or create a hostile work environment for Plaintiff.

156. Furthermore this is the second white employee that Plaintiff has tried to discipline and only to have been impeded by the OOC.  Yet Plaintiff has had two minority employees (a black male and a Hispanic male with a strong Spanish accent) both of whom Plaintiff was strongly encouraged and, in one case, forced against her judgment, to discipline.

Complaint for Damages and
Equitable Relief
Page 32 of 48
Wigfall v Office of Compliance
Case # TBD

157.   During her tenure as Manager Plaintiff has directly supervised a total of six full time FTE's and two (2) contractors.  Three of six FTE's were minorities and 3 were white. There were performance issues that Plaintiff has had to address with four of those employees; two (2) white, one (1) Spanish and one (1) African American.  The General Counsel and others pressured Plaintiff to discipline the Spanish employee, Luis Guzman, against Plaintiff's judgment until he left in 2011. When Plaintiff let management know that she had a performance issue with the African American male, Roger Kager, the General Counsel suggested firing him.  Plaintiff finally was able to persuade the General Counsel not to fire Kager but rather, demoting him instead.  The OOC demoted him and decreased his pay in 2014. He resigned on his own a few months later. Plaintiff was requested to handle the disciplinary issues with both of the minority employees including the write up and all of the discussions.

158.   The personnel issues that Plaintiff had with the two white employees were handled differently. The one performance issue ended up being tied to an Inspector General investigation.  The second one is an ongoing attendance issue. Plaintiff was told in both instances that she was not able to discipline the two white employees David Young (2011) and Sara Hoover (2015-2016). Plaintiff wrote Mr. Young up and was told that she could not give him the write up.  Plaintiff wrote Sara Hoover up and was told the same thing.  Plaintiff believe that this is racially motivated.  Plaintiff have never been given any explanation why Plaintiff was unable to address either situation.

159.   On June 9, 2016, Plaintiff met with Hillary Benson, John D. Uelmen and two of Plaintiff's employees about case 2015-03.  OSH has re-written this report several times and recommended to Uelmen that the case not be closed because there are Engineering

reports detailing hazards and we felt it should not be closed. On this day Uelmen argued with Plaintiff about safety definitions, the fact that he thought OSH's concerns were not important, etc...  Finally Uelmen agreed to have a meeting with the employing office which occurred approximately two months later in early August 2016.  John D. Uelmen has dragged this case out for months because OSH will not agree with him that there are no hazards. Yet he accuses Plaintiff of not being able to turn around cases in 60 days. This was one of the priority cases that Uelmen put in his write up memorandum of Plaintiff on April 20, 2016.  This is just one of many instances in which Plaintiff believes the rights of employees under the CAA to a safe and healthy workplace are, or potentially are, being infringed by General Counsel John D. Uelmen, and Plaintiff has opposed such infringement.

160.    On June 15, 2016, during the Management staff meeting Barbara J. Sapin introduced a new contract/purchasing process that she said all Program Managers and above were supposed to follow. Sapin went through the process and then asked if anyone had questions. Plaintiff tried to ask for clarification about her role in the process. Uelmen cut Plaintiff off in mid-sentence and refused to let Plaintiff finish her question. These changes in Sapin's process affected Plaintiff because she managed two contracts. Uelmen repeatedly said that "the attorneys would take care of this" (who are all directly under Uelmen's supervision) which was contrary to what Sapin was saying in the meeting. Uelmen was very rude to Plaintiff. At one point Plaintiff said that she was just trying to get clarification about her role in the process. Deputy Director for the House Paula Sumberg (white female) spoke up and said that she had similar questions. Sapin tried to answer Sumberg's questions; Plaintiff's have never been answered. Plaintiff thereafter

sent two emails to Uelmen about clarification of her responsibilities in this process. The last one was dated July 13, 2016. Uelmen has failed to respond or to clarify Plaintiff's part in this process.

161.    On June 20, 2016, Hillary Benson came to the door of Plaintiff's office and said that she needed to talk to Plaintiff about a case. Plaintiff told her "let's go get a conference room." Nevertheless she came in and sat down in Plaintiff's office saying, "I put the stuff on this morning at 6:00 AM so it should not bother you." This was incorrect.  The smell was still strong and it did bother Plaintiff who put up with it because she felt that she did not have a choice.

162.    On July 20 and 21, 2016, Plaintiff was in close proximity to Hillary Benson in meetings and had strong reactions to the pesticide that she was wearing. Symptoms included nose, eyes and face burning and difficulty breathing.  This situation, like so many others, have put Plaintiff in the difficult position of either saying something to Hillary Benson who will then run to John D. Uelmen and complain about Plaintiff, or Plaintiff can suffer in silence which Plaintiff has chosen to do on numerous occasions.

163.    On July 13, 2016, Plaintiff sent an email to John about the final document regarding purchasing that Sapin sent out as a follow up to the June 15, 2016 meeting. Plaintiff again asked about her responsibilities in reference to the procedures that Sapin sent out for the office. Uelmen has not answered Plaintiff's email.

164.    On July 18, 2016, during the General Counsel meeting Uelmen again directed staffing/management questions to Brent Dittman for upcoming inspections. Dittman did not know the answer so Plaintiff interrupted and provided the information. This is just one of many examples of Uelmen and Benson regularly undermining Plaintiff's

authority, especially relative to her employees, as well as displaying contempt for Plaintiff.

165. On July 28, 2016, Plaintiff met with Uelmen, Benson and Shonda Perkins. Plaintiff had requested a case status meeting with Uelmen.  When they reached case 2015-08 (OOC internal case, Madison Room LM-318) Uelmen got really nasty about this report. He said that he was having it reviewed by a contracted CIH (Kennedy) that he hired without any communication or coordination with OSH.  Uelmen said that there was a conflict of interest with this case. Plaintiff told him that she was not aware that there was an issue with the case or the findings.  Uelmen said that the findings did not make sense because "there was no mold in the room." Plaintiff said, "so you are saying that even though sampling showed mold, you are saying there was none?"  Uelmen questioned the air sampling and said that Kennedy has an expertise with mold. Shonda Perkins began to ask Uelmen questions about what Kennedy's role would be in this case since the work had been done months ago. She asked if Kennedy was going to sample. Uelmen said that he didn't know but he needed an outside opinion and Kennedy has his own equipment and will know what to do. Plaintiff reminded Uelmen that two sets of sampling showed mold. Uelmen said that "he didn't care. He didn't see any mold." Plaintiff told Uelmen that many times you can't see mold. The OSH team did not see mold either. Plaintiff suggested that the two CIH's talk to each other like we do in other cases when we let the technical people work out issues. Uelmen said no, he is going to supervise this situation. Plaintiff told Uelmen that if he was controlling the process the information might not get relayed properly. Uelmen was very angry and loud. Shonda Perkins asked what else this person would be doing. Uelmen said that he is going to use Kennedy to review other

cases. He said that he also intends to use Kennedy to make recommendations for the next Congress. John said that he wants to move away from a "got you" mind set and more into education. Uelmen said that he is the General Counsel and can do whatever he chooses to do.

166.    Ongoing from April through August 2016 Hillary Benson approached Shonda Perkins requesting information for the OOC annual report. Shonda came to Plaintiff for assistance. Plaintiff advised her to put the request in writing to Hillary Benson to confirm what she was asking for. Perkins and Plaintiff both had concerns about information that Hillary Benson provided to Perkins. Perkins ended up having to go back to Hillary multiple times for clarification about what was being asked. Perkins issued the information to Hillary after Plaintiff approved it. Benson wrote the Safety section of the Annual report; an important duty previously of Plaintiff as OSH Program Manager. Plaintiff did not have an opportunity to review what Benson wrote until after the Annual Report was published. There were inaccuracies in the Annual Report. Hillary misquoted what Perkins had provided her. In the past the OSH Program Manager wrote the Safety report and reviewed the final copy. Most people looking at the report will believe that Plaintiff had at a minimum reviewed it. Plaintiff documented the errors.  Later a portion of the safety report appeared in a National Safety Council document. Plaintiff went to Uelmen and let him know that what appeared in the National Safety Council from the Annual report was incorrect. As usual he ignored Plaintiff even though she told him in person.

167.    On August 19, 2016, Hillary Benson came by Plaintiff's work area and stopped. Plaintiff had been speaking with Sara Hoover, a white female employee. Benson wished Sara

Complaint for Damages and
Equitable Relief                                Page 37 of 48                    Wigfall v Office of Compliance
Case # TBD

Hoover a good night and a good trip. Plaintiff was looking directly at Benson for much of this exchange but she acted as if Plaintiff was not present and left without speaking a word to Plaintiff.

168.    John Uelmen has increased Plaintiff's work load at least since the first mediation session in Plaintiff's prior case before the Office of Compliance, Case # 16-0C-36.   Prior to requesting counseling in Case # 16-0C-36 Plaintiff's work load was already excessive.  It has become untenable.

169.    On Tuesday, September 6, 2016, further increasing that work load, John Uelmen informed Plaintiff that Plaintiff was required to complete and turn into him four (4) employee evaluations by Friday, September 9, 2016.

170.    When Plaintiff informed Mr. Uelmen that she was already overloaded with other matters that were to be completed on a priority basis and requested Uelmen tell her which projects (e.g. the pre-existing matters or the employee evaluations) were the priority that she should work on so that they would be completed as had been required Uelmen replied, more or less, "They are all priorities" without any further guidance.   Plaintiff understood Uelmen's response to require her to work as many hours as necessary to accomplish ALL of the pre-existing matters due by Friday, September 9, or soon thereafter, as well as the four (4) employee evaluations by Friday.

171.    The Employing Office and John D. Uelmen are saddling Plaintiff with more and more work out of a retaliatory and/or discriminatory animus based upon Plaintiff's prior protected activities under the Congressional Accountability Act and upon Plaintiff's protected statuses.  It also appears that the Employing Office and John D. Uelmen is attempting to drive Plaintiff to resign from her position by imposing demands upon her

Complaint for Damages and
Equitable Relief                                Page 38 of 48                    Wigfall v Office of Compliance
                                                                                 Case # TBD

which would drive any reasonable person so situated to conclude that their only viable option is to terminate employment.

172.     On September 12, 2016, Plaintiff had sent an email to John Uelmen advising him that she was unable to get all of the work done.  The four performance evaluations were written but Plaintiff was unable to meet with the employees.  Plaintiff told him that Plaintiff planned to meet with 3 out of the 4 employees regarding their reviews between Monday and Tuesday.  The last employee was out of the office until Friday September 16, 2016, and Plaintiff would meet with her then. Uelmen, surprisingly, responded with an email telling Plaintiff to send him the performance evaluations for his review. He also said that he wanted to be in the meetings with Plaintiff's employees.  He said that he wanted to give the employees input about their ADA performance.  Plaintiff told him that Plaintiff did have ADA covered in each of the employee's performance evaluations. Plaintiff sent the reviews to Uelmen and in the email asked when could she expect her own review. Uelmen did not respond to Plaintiff's email.

173.     Plaintiff and Uelmen met with Sara Hoover (white female). During Sara's review Plaintiff covered her attendance issue.  Plaintiff told her that she still continued to be late and that was an issue. When Plaintiff completed Sara's review Uelmen told her that she had done a good job with ADA.    Plaintiff found that particularly interesting since Uelmen had complained to Plaintiff that she had not attended any of the ADA training. She was the only employee to miss all of the ADA training. Uelmen went on to tell Hoover that he was interested in using her consultative background for training and changes he planned to make in the 115th Biennial.   Uelmen never addressed her attendance issue even though he said that he was there to provide feedback.

Complaint for Damages and
Equitable Relief                    Page 39 of 48                    Wigfall v Office of Compliance
Case # TBD

174.    On September 13, 2016, John and Plaintiff met with Brent Dittman (white male) regarding his performance review.   Brent asked if he would be receiving a bonus and Uelmen told him no one was receiving one this year. Brent let Uelmen know that he was very disappointed.   He also let Uelmen know that he was concerned about people not coming to work on time and being permitted to continue to do this.  He told Uelmen that it wasn't fair that he and others had to do extra work daily because Sara Hoover was late. He told Uelmen that it was embarrassing to have to make excuses daily for Hoover. Uelmen assured him that it was being addressed.  He also told Brent that he was going to try to get him a salary increase and told him that he had done an exceptional job with ADA.

175.    After meeting with Brent Dittman Uelmen and Plaintiff spoke for a few minutes. Plaintiff told Uelmen that she was glad to hear that he was going to try to get a raise for Dittman. Uelmen said that he was going to try to get one for Dittman and Christina Bailey (Indian female).  Plaintiff told him that if he was going to do that he should also consider doing something for Shonda Perkins (African-American female). Plaintiff told him that she has done a lot of work and Plaintiff felt that Perkins was deserving of an increase even more than Bailey and Dittman and explained why. Uelmen said, "You will have to show me what she is doing".  Plaintiff told him that he would get to hear when Plaintiff covered her performance on Friday.  Plaintiff told him that she was extremely valuable in getting the work done.

176.    Plaintiff  and Uelmen later sat with Christina for her performance evaluation. Uelmen told her that she had done a good job with ADA. He did not mention getting her a raise.

177.    On September 16, 2016, Uelmen and Plaintiff met with Shonda Perkins (African-

American female) so that Plaintiff could give her performance review.  After Plaintiff was finished Uelmen did not treat Shonda the same way that he had the others.  He did not give Shonda any feedback regarding ADA even though she had worked on ADA surveys. Plaintiff had to ask Uelmen if he had any feedback for her. He said that Evan Terry, representative of an ADA consulting firm retained by the Office, did not give him any for her and it appeared that he didn't ask for any.  It was very awkward and Plaintiff found that disturbing. The conversation with Shonda Perkins was not like it had been with Hoover (white female) and Brent Dittman (white male). Perkins let Uelmen know that she had done ADA work with the other Safety Specialist and with Evan Terry during the performance period.

178.    The bases of Plaintiff's concerns are as follows: retaliation, hostile work environment, harassment, race discrimination, color discrimination, gender discrimination and age discrimination.  Plaintiff's requests for accommodation of her disability have largely been ignored.  When the OOC finally did deign to implement some type of accommodation it was inadequate.  Plaintiff is informed and believes and thereon alleges that the OOC failure to engage in an interactive process with her and/or to implement an effective accommodation was motived by racism, colorism, sexism, ageism and/or retaliation for prior protected activities under the CAA.

179.    Plaintiff also believes she has been misclassified as an exempt employee has not been paid overtime in violation of her wage and hour rights.

## VI.  STATEMENT OF CLAIMS

### COUNT ONE
### Violation of the Prohibition of Intimidation or Reprisal
### (2 U.S.C. §1317)

180. The foregoing paragraphs are incorporated herein as if set forth in full.

181. Plaintiff was subjected to intentional intimidation, reprisal and retaliation by Defendant and its agents resulting in giving Plaintiff the negative 2015 Performance Evaluation, failing to engage in an interactive process regarding a reasonable accommodation of a disability, failing to provide a reasonable accommodation of a disability, not receiving overtime pay, receiving insufficient bonuses, being required for years to cover the work of a missing FTE on her team, receiving biased memoranda with cherry-picked facts reprimanding Plaintiff for job performance issues, having her supervisorial authority usurped and her managerial duties removed, and in being subjected to other acts of Defendant for engaging in multiple protected acts of complaining to the OOC and its Board about her belief that racial, color and gender discrimination was occurring in the OOC.

182. Plaintiff was similarly subjected to intentional intimidation, reprisal and retaliation by Defendant and its agents due to Plaintiff's protected activities of promoting employees rights, including her own rights, under the CAA to safe and healthy workplaces, and opposing practices that seek to diminish or obviate those rights.

183. Defendant did not act in good faith as to any CAA §207 (2 U.S.C. §1317) violations alleged herein Count One.

### COUNT TWO
### <u>Violation of Civil/Nondiscrimination Rights</u>
### (2 U.S.C. §1311)

184. The foregoing paragraphs are incorporated herein as if set forth in full.

185. Defendant intentionally discriminated against Plaintiff based upon gender when it

Complaint for Damages and
Equitable Relief                    Page 42 of 48                    Wigfall v Office of Compliance
                                                                     Case # TBD

committed each and every adverse act against Plaintiff including but not limited to those adverse actions described herein this Complaint.

186.     Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Two.

## COUNT THREE
### Violation of Civil/Nondiscrimination Rights
**(2 U.S.C. §1311)**

187.     The foregoing paragraphs are incorporated herein as if set forth in full.

188.     Defendant intentionally discriminated against Plaintiff based upon race when it committed each and every adverse act against Plaintiff including but not limited to those adverse actions described herein this Complaint.

189.     Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Three.

## COUNT FOUR
### Violation of Civil/Nondiscrimination Rights
**(2 U.S.C. §1311)**

190.     The foregoing paragraphs are incorporated herein as if set forth in full.

191.     Defendant intentionally discriminated against Plaintiff based upon skin color when it committed each and every adverse act against Plaintiff including but not limited to those adverse actions described herein this Complaint.

192.     Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Four.

## COUNT FIVE
### Violation of Civil/Nondiscrimination Rights
**(2 U.S.C. §1311)**

193.     The foregoing paragraphs are incorporated herein as if set forth in full.

Complaint for Damages and
Equitable Relief                     Page 43 of 48            Wigfall v Office of Compliance
                                                             Case # TBD

194.    Defendant intentionally discriminated against Plaintiff based upon age when it committed each and every adverse act against Plaintiff including but not limited to those adverse actions described herein this Complaint.

195.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Five.

### COUNT SIX
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

196.    The foregoing paragraphs are incorporated herein as if set forth in full.

197.    Defendant intentionally discriminated against Plaintiff based upon disability when it failed to provide a reasonable accommodation of a disability.

198.    Defendant intentionally discriminated against Plaintiff based upon disability by failing to engage in an interactive process regarding a reasonable accommodation of a disability.

199.    Defendant intentionally discriminated against Plaintiff based upon disability when it repeatedly took actions and/or condoned actions performed with the intention of causing physical harm to, or with wonton and reckless disregard for, the health of Plaintiff through triggering Plaintiff's disability.

200.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Six.

### COUNT SEVEN
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

201.    The foregoing paragraphs are incorporated herein as if set forth in full.

202.    Plaintiff was subjected to pervasive and persistent acts of intimidation, reprisal and retaliation so as create as harassing and hostile work environment.

Complaint for Damages and
Equitable Relief                    Page 44 of 48                    Wigfall v Office of Compliance
                                                                   Case # TBD

203.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations

alleged herein Count Seven.

## COUNT EIGHT
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

204.    The foregoing paragraphs are incorporated herein as if set forth in full.

205.    Plaintiff was subjected to pervasive and persistent acts of gender discrimination so as

create as harassing and hostile work environment.

206.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations

alleged herein Count Eight.

## COUNT NINE
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

207.    The foregoing paragraphs are incorporated herein as if set forth in full.

208.    Plaintiff was subjected to pervasive and persistent acts of race discrimination so as create

as harassing and hostile work environment.

209.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations

alleged herein Count Nine.

## COUNT TEN
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

210.    The foregoing paragraphs are incorporated herein as if set forth in full.

211.    Plaintiff was subjected to pervasive and persistent acts of skin color discrimination so as

create as harassing and hostile work environment.

212.    Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations

alleged herein Count Ten.

## COUNT ELEVEN
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

213.  The foregoing paragraphs are incorporated herein as if set forth in full.

214.  Plaintiff was subjected to pervasive and persistent acts of age discrimination so as create as harassing and hostile work environment.

215.  Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Elevent.

## COUNT TWELVE
### Violation of Civil/Nondiscrimination Rights
### (2 U.S.C. §1311)

216.  The foregoing paragraphs are incorporated herein as if set forth in full.

217.  Plaintiff was subjected to pervasive and persistent acts of disability discrimination so as create as harassing and hostile work environment.

218.  Defendant did not act in good faith as to any CAA §201 (2 U.S.C. §1311) violations alleged herein Count Twelve.

## COUNT THIRTEEN
### Violation of the Fair Labor Standards Acts of 1938
### (2 U.S.C. §1313)

219.  The foregoing paragraphs are incorporated herein as if set forth in full.

220.  Defendant violated the Fair Labor Standards Act by not paying Plaintiff overtime pay for overtime worked.

221.  Defendant did not act in good faith as to any CAA §203 (2 U.S.C. §1313) violations alleged herein Count Nine.

222.  Defendant willfully violated CAA §203 (2 U.S.C. §1313) as it knew its violations alleged herein Count Thirteen were unlawful.

Complaint for Damages and
Equitable Relief                                   Page 46 of 48                  Wigfall v Office of Compliance
Case # TBD

## VII.  PRAYER FOR RELIEF

223.   WHEREFORE, Plaintiff TERRY R. WIGFALL requests:

224.   An award of compensatory damages for extreme embarrassment, humiliation and mental anguish and physical harm in the amount of $300,000 pursuant to CAA §201(b)(1);

225.   An award of liquidated damages for in the amount of $150,000 pursuant to CAA §201(b)(2);

226.   An award of compensatory damages for extreme embarrassment, humiliation and mental anguish and physical harm in the amount of $300,000 pursuant to CAA §201(b)(3);

227.   An award of back pay damages for unpaid overtime in the amount of $65,000 and liquidated damages thereon in the amount of $65,000 pursuant to CAA §203(b);

228.   An award of $600,000 as a legal remedy to redress violations of CAA §207(a);

229.   Interest on the amount of damages at the prevailing rate and according to proof;

230.   An order requiring Defendant to adjust Plaintiff's October 2015 Performance Review to a positive review or , in the alternative, an order prohibiting Defendant from distributing or otherwise providing copies of or the contents thereof to any individual or entity, public or private, except under order of another court or Congress;

231.   An order requiring Defendant to adjust Plaintiff's SF-50 to reflect no negative information regarding Plaintiff;

232.   An order prohibiting Defendant from (a) placing or maintaining John D. Uelmen or Barbara J. Sapin in Plaintiff's chain of command; (b) allowing John D. Uelmen or Barbara J. Sapin to participate in or contribute to Plaintiff's future performance reviews, bonus considerations, raise evaluations, evaluations for promotion, or any other aspect of Plaintiff's employment with Defendant;

233.    Reinstatement of all annual and sick leave time used by Plaintiff in prosecuting her

claims herein; and

234.    Reasonable attorney's fees and other costs according to proof;

Respectfully Submitted,

Donald A. MacKay          DC BAR #986316
Attorney at Law
14071 Peyton Drive, Unit 2436
Chino Hills, CA  91709-7208
Phone: 202-642-4646
Fax: 866-365-8821
Email: don@damackay.com