## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERRY R. WIGFALL, ) | Case No. 1:16-CV-02332 CKK |
| Plaintiff, ) | |
| v. ) | JURY TRIAL DEMANDED |
| OFFICE OF COMPLIANCE ) <br> Adams Building, Room 200 ) <br> 110 Second Street, SE ) <br> Washington, DC 20540-1999 ) | |
| Defendant. ) | |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff Terry R. Wigfall, by her undersigned counsel, complains of Defendant Office of Compliance (hereinafter "OOC"), as follows:

## NATURE OF THE CASE

1. This is an action to recover damages for Defendant's unlawful discrimination in violation of the Congressional Accountability Act ("CAA").

2. Defendant discriminated against Plaintiff and subjected her to a hostile work environment based on her gender, disability, and race, and retaliated against her for complaining of discrimination.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the claims pursuant to 2 U.S.C. § 1408(a) of the Congressional Accountability Act (hereinafter, "CAA"). Plaintiff: (1) is a covered employee by virtue of her position with OOC; (2) completed counseling and mediation pursuant to 2 U.S.C. §§ 1402-03 of the CAA; and (3) filed this civil action within the proscribed time period.

4. Venue is proper because Defendant formerly employed Plaintiff in DC.

## THE PARTIES

5. During the relevant time period, Plaintiff worked for Defendant and was an employee pursuant to the CAA.

6. Defendant Office of Compliance is a United States Government legislative agency primarily located in the United States Capitol Complex. Defendant is subject to Title VII of the Civil Rights Act of 1964, the Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990, as applied by the Congressional Accountability Act of 1995.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7. On April 25, 2016, Plaintiff submitted her first request for counseling based on claims of discrimination and hostile work environment based on gender, race, and disability.

8. On June 14, 2016, Plaintiff requested mediation on her first set of claims.

9. OOC concedes that the mediation period ended on August 25, 2016.

10. On August 22, 2016, Plaintiff submitted her second request for counseling based on claims of discrimination and hostile work environment based on gender, race, and disability, as well as retaliation for prior EEO activity.

11. On September 22, 2016, Plaintiff requested mediation on her second set of claims.

12. On October 24, 2016, OOC notified Plaintiff that mediation had ended on her second set of claims.

13. On November 23, 2016, Plaintiff filed the instant action in this Court. Plaintiff's complaint was filed 90 days after the mediation period ended on her first set of claims, and 30 days after the mediation period ended on her second set of claims.

## FACTS

*Plaintiff is a member of a protected class.*

14. Plaintiff is an African American female.

15. At all times relevant to this complaint, Defendant was aware of Plaintiff's gender and race based on her physical appearance.

16. Plaintiff suffers from disabilities (bronchitis, allergies, physical reactions to chemical substances) that substantially limit one or more major life activity.

17. At all relevant times to this complaint, Defendant was aware of Plaintiff's disability because she complained to various supervisors.

*History of discrimination within OOC.*

18. Plaintiff began working for OOC in 2007.

19. During Plaintiff's employment with Defendant, the majority of her supervisory chain, the three individuals who served as the General Counsel, and most members of management appeared to be Caucasian and/or of white or very light skin color.

20. Barbara Sapin (Caucasian) is OOC's Executive Director.

21. Amy Dunning (Caucasian) was OOC's General Counsel between approximately 2013 and 2015.

22. John Uelmen (Caucasian) has been OOC's General Counsel since 2015.

23. In or around 2010, Plaintiff began working with Mr. Uelemen, then a Senior Attorney at OOC. From the outset, it appeared that Mr. Uelmen had trouble interacting with non-white employees. He frequently ignored Plaintiff and other non-white employees.

24. In or around April 2010, Plaintiff applied for the position of OSH Program Manager. Though she was qualified with nearly two decades of OSH experience and progressed to the second

round of interviews, when Plaintiff arrived to her scheduled interview, the panel told Plaintiff that they had no questions for her.

25. Several weeks later, Plaintiff had not yet been notified of a decision on the position, but overheard the Assistant General Counsel Susan Green (Caucasian) tell another employee that the person chosen for the position chose not to take the job.

26. Plaintiff subsequently requested a meeting with Ms. Green and was told that the panel could not find a qualified person for the position.

27. A white female, Faith Perry, was later selected for the position of OSH Program Manager.

28. Plaintiff subsequently met with Executive Director Tamara Chrisler (African-American) to share her concerns of race discrimination within OOC.

29. A few weeks later, in or around May 2010, Ms. Green and General Counsel Peter Eveleth (Caucasian) told Plaintiff that OOC had created a position for her, Compliance Coordinator. Plaintiff's position reported to Ms. Perry.

30. Plaintiff trained Ms. Perry for the position. Ms. Perry often commented that Plaintiff should have her job.

31. Plaintiff and Ms. Perry agreed that Plaintiff had the skills to do the job but General Counsel Eveleth did not want Plaintiff in a high profile position.

32. In or around March 2013, Plaintiff became the OSH Program Manager after Ms. Perry resigned and recommended Plaintiff for the position.

33. Following Plaintiff's promotion to OSH Program Manager in 2013, Defendant failed to hire an employee into Plaintiff's old position, Compliance Coordinator. Plaintiff repeatedly complained that she was doing the work of two positions, however Defendant refused to hire an individual into the Compliance Coordinator position.

*Selection of General Counsel Uelmen and Concerns of Racial Discrimination.*

34. In fall 2013, OOC began the process of interviewing for a new General Counsel. Mr. Uelmen was considered as a candidate.

35. During the interview process, minority employees, including Plaintiff, raised concerns to Executive Director Barbara Sapin that Mr. Uelmen was racist and sexist.

36. Amy Dunning was chosen as General Counsel in 2013.

37. Though Mr. Uelmen was not chosen as General Counsel in 2013, he was later appointed sometime in 2015.

38. Throughout Mr. Uelmen's employment with OOC, and continuing today, he has regularly engaged in rude and inappropriate behavior toward Plaintiff including, but not limited to, regularly interrupting Plaintiff while presenting/reporting information at meetings and minimizing Plaintiff's achievements. Mr. Uelmen does not engage in similar behaviors when white males and white females are presenting information at meetings.

39. Mr. Uelmen's poor treatment of Plaintiff intensified after she recommended to the Board that he not be chosen as General Counsel in 2013.

*AOC Health and Safety Violations.*

40. Between August 2015 and October 2015, Plaintiff, in her role as OSH Program Manager, completed three reports containing findings of health and safety issues in cases filed by three employees of the Architect of the Captiol's Inspector General's Office (hereinafter, "AOC reports").

41. In or around October 2015, General Counsel Amy Dunning informed Plaintiff that she (Dunning) planned to strip from the report Plaintiff's findings, leaving the report to state that there were no findings. Plaintiff strongly objected to Dunning's plan and documented her

objections in writing to Dunning. Plaintiff reasonably believed that Dunning's plan was an unlawful violation of the rights of the three employees to a healthy and safe workplace under the CAA.

42. The OSH team was largely composed of minority employees, while the attorneys that reviewed the safety reports and stripped findings of violations were mostly white.

*Negative Performance Evaluation.*

43. On October 28, 2015, Plaintiff received a negative performance evaluation written by Ms. Dunning. The performance evaluation is the only negative evaluation Plaintiff has received in her twenty-eight years in the health and safety field.

44. Because of Plaintiff's negative performance evaluation, she was denied a bonus in 2015.

45. Plaintiff met with Ms. Sapin about the performance evaluation on October 30, 2015, and stated that she was disappointed in the office for allowing racism to dominate the culture. While Ms. Sapin refused to speak about Plaintiff's performance evaluation, she requested another meeting to discuss Plaintiff's distrust in the office.

46. On November 5, 2015, Plaintiff had a follow up meeting with Ms. Sapin. Plaintiff again expressed concerns of racial discrimination in the office. Specifically, Plaintiff complained that she and other minority employees were marginalized and ignored by white staff, and that their feedback on OSH investigations was frequently ignored.

*Discovery of Health and Safety Violations in LM-318.*

47. On or around August 25, 2015, an OOC employee, Sharita Daniels Obiora (African-American) complained to Plaintiff of her concerns of health and safety violations in one of OOC's file rooms, LM-318. Ms. Obiora had been complaining to management since 2009, however management continued to demand that Ms. Obiora and other employees work in the

LM-318 file room.

48. While discussing the investigation of safety concerns in LM-318, Ms. Sapin told Plaintiff that Ms. Obiora's complaints were exaggerated.

49. On August 27, 2015, Plaintiff conducted an inspection of LM-318. Plaintiff immediately returned to her office after the inspection to write a report.

50. A professional team later assessed LM-318 and found four separate variations of mold in the office.

51. On December 7, 2015, Plaintiff informed management of the team's findings. Ms. Sapin became visibly upset and stated that there should be no findings because the situation was being abated. Specifically, she stated that a cleaning crew was coming to remove moldy boxes from the offices. Plaintiff explained that this would not contain the mold situation and Ms. Sapin grew more upset.

52. In or around December 2015, Plaintiff learned that Mr. Uelmen stopped processing Plaintiff's report regarding LM-318. Mr. Uelmen also changed the process of OSH safety reports, whereby attorneys completed a final review without input from the OSH team. Many times, attorneys stripped the reports of findings of violations.

53. To Plaintiff's knowledge, no final report has ever been issued regarding safety violation sin LM-318.

*Change in Plaintiff's Job Responsibilities.*

54. In or around November 2015, Plaintiff drafted calendars containing inspection dates for the OSH team, and sent them to Mr. Uelmen for approval.

55. On December 9, 2015, Mr. Uelmen returned the calendar proposal with additional job duties. Mr. Uelmen increased the schedule from 3 days of inspections per week to 4 days per week,

and added inspections pursuant to the Americans with Disabilities Act ("ADA").

56. Plaintiff explained to Mr. Uelmen that the OSH team could not complete the added inspections in addition to their already heavy workload. Plaintiff believes that Mr. Uelmen added the additional job responsibilities to set up the OSH team for failure and in retaliation for her insistence that OOC issue findings of safety violations in the LM-318 investigation.

### *Failure to Accommodate Plaintiff's Disabilities.*

57. In or around spring 2016, Attorney Hillary Benson began applying mosquito repellant while in OOC offices. On or about March 25, 2016, Plaintiff spoke with Ms. Benson by phone to discuss her severe negative reactions to the repellant. Ms. Benson explained to Plaintiff that she was pregnant and needed to wear the insect repellant to avoid catching the Zika virus.

58. Plaintiff immediately began having significant negative, physically disabling reactions to the repellant, including difficulty breathing. This materially impacted her ability to perform her job duties.

59. In late-March 2016, Plaintiff informally approached OOC management, including Mr. Uelmen, about her reactions to the repellant. Plaintiff asked for a reasonable accommodation.

60. Mr. Uelmen stated that Plaintiff's symptoms, if real, were the result of some other factor unrelated to the workplace. Mr. Uelmen stated that he believed Plaintiff's symptoms were merely the result of seasonal allergies.

61. As a result of Ms. Benson's use of mosquito repellant inside OOC's offices, Plaintiff missed numerous days of work because she had difficulty breathing. When Plaintiff was in the office, she was required to work in an empty conference room that was far from Ms. Benson's workspace.

62. Throughout March and April 2016, Plaintiff met with OOC Counselor Richard Smith and

Deputy Director for the Senate Woody Anglade regarding her need for a reasonable accommodation.

63. On April 5, 2016, Plaintiff became ill while in her office and had difficulty breathing. Plaintiff immediately spoke with Mr. Anglade about her concerns. Mr. Anglade assured Plaintiff that he would speak with Mr. Uelmen, but made no efforts to accommodate Plaintiff at that time. Mr. Anglade never followed up with Plaintiff.

64. The following day, Plaintiff again met with Mr. Uelmen again regarding the insect repellant. Mr. Uelmen told Plaintiff that she should be understanding because this was an issue with Ms. Benson's baby, and that Ms. Benson's doctor had stated that she needed to wear insect repellant. Mr. Uelmen also noted that Plaintiff seemed to be the only one affected by the repellant.

65. On another occasion Mr. Uelmen stated, "I know that you believe this is what is happening, but we don't agree." Mr. Uelmen mentioned Ms. Benson's rights under the Americans with Disabilities Act ("ADA"). Plaintiff was disturbed by Mr. Uelmen's comment about Ms. Benson's rights under the ADA because he blatantly ignored Plaintiff's rights under the ADA.

66. Plaintiff took sick leave on April 14 and 15 to recover from bronchitis that she developed as a result of Ms. Benson's excessive use of insect repellant inside OOC offices.

*April 18 Staff Meeting and Reprimand.*

67. On April 18, 2016, during the General Counsel Staff meeting, Mr. Uelmen acted aggressively towards Plaintiff. Plaintiff believes that the aggressive treatment was in retaliation for requesting a reasonable accommodation.

68. Two days later, on April 20, 2016, Uelmen sent Plaintiff a memorandum to express his expectations as noted in their April 18 meetings. Mr. Uelmen made several accusations of

9

Plaintiff disregarding her job duties.

*First Request for Counseling.*

69. On April 25, 2016, Plaintiff filed her first request for counseling with OOC. Plaintiff discussed the issues contained above.

70. Plaintiff thereafter completed counseling and requested mediation on June 14, 2016, as required under 2 U.S.C. § 1408(a) of the CAA. The mediation period ended on August 25, 2016.

*Retaliation and Continued Failure to Accommodate.*

71. On May 2, 2016, during a staff meeting, Mr. Uelmen allowed all employees to report on what each are working on for the upcoming week. Mr. Uelmen did not permit Plaintiff to speak, and ignored her when she asked if he was interested in hearing what the OSH team was working on.

72. On May 4, 2016, Plaintiff scheduled a meeting with Mr. Uelmen and Ms. Benson. When Plaintiff arrived, she purposely sat at the opposite end of the conference room from Ms. Benson to be near ventilation. Ms. Benson entered the room and passed empty seats to sit near Plaintiff. Plaintiff believes that Ms. Benson intentionally sat next to her despite knowing that Plaintiff was having reactions to Ms. Benson's insect repellant. This irritated Plaintiff's breathing.

73. On May 11, 2016, Plaintiff sent Mr. Uelmen an email to alert him that she was still having problems with the repellant. Mr. Uelmen failed to respond to Plaintiff's message.

74. In a meeting on May 18, 2016, Ms. Benson again passed empty seats to sit very close to Plaintiff, which irritated her breathing.

75. Later that day, after discussing the issue with coworkers, staff from the Architect of the Capitol

("AOC") came to Plaintiff's office to discuss cleaning the floor and wall panels as a way to reduce the odor of the repellant.

76. After learning that Plaintiff met with AOC staff, Ms. Sapin scolded Plaintiff. Plaintiff explained that she did not request to meet with the AOC staff, but Ms. Sapin continued to act in an angry and aggressive manner.

77. OOC wholly failed to accommodate Plaintiff or engage in an interactive process to determine appropriate reasonable accommodations.

78. In late-May 2016, Mr. Uelmen requested that Plaintiff apologize to Ms. Benson because she had no proof that the insect repellant was making her sick.

79. In late-May 2016, when Mr. Uelmen alerted the office that there would be a spring-cleaning to include panels and floors. Plaintiff does not believe that the spring cleaning was related to her request for a reasonable accommodation.

80. On May 26, 2016, the panels in Plaintiff's office were cleaned and she was able to work in her office for the first time in weeks.

*Continued Racial and Gender Disparities.*

81. On May 31, 2016, Plaintiff met with Mr. Uelmen about an issue with her direct report Sara Hoover (Caucasian). Ms. Hoover was frequently tardy and was not responsive to Plaintiff's informal counseling. Mr. Uelmen told Plaintiff to write up Ms. Hoover because she was AWOL according to OOC policy.

82. However, on June 3, 2016, when Plaintiff handed Mr. Uelmen the write-up, he stated that he would meet with Ms. Hoover in lieu of a formal write-up. During the meeting, Ms. Hoover blamed her tardiness on Plaintiff changing her (Ms. Hoover's) shift. Mr. Uelmen appeared to agree with Ms. Hoover and failed to reprimand her at the meeting.

83. Ms. Hoover continues to be tardy nearly every day and Mr. Uelmen continues to refuse to allow Plaintiff to give Ms. Hoover a formal write-up.

84. In or around May and June 2016, Mr. Uelmen strongly encouraged Plaintiff to discipline non-white employees against Plaintiff's judgment, however he refused to allow Plaintiff to discipline Ms. Hoover and another white employee, David Young.

85. In a meeting on July 18, 2016, Mr. Uelmen ignored Plaintiff and directed several staffing and management questions to Plaintiff's subordinate Brent Dittman (Caucasian), who did not know how to answer. Plaintiff stepped in to answer the questions.

*Plaintiff's Second Request for Counseling.*

86. On August 22, 2016, Plaintiff filed her second request for counseling as to the continued discrimination and retaliation that occurred after her first request in April 2016.

87. Plaintiff thereafter requested mediation on September 22, 2016. On October 24, 2016, OOC notified Plaintiff that mediation had ended on her second set of claims.

88. On September 6, 2016, shortly after Plaintiff's second request for counseling, Mr. Uelmen further increased Plaintiff's workload by requiring her to complete four employee evaluations by COB on Friday, September 9.

89. Plaintiff informed Mr. Uelmen that she was overworked with several matters and asked him to tell her which items were first priority. Mr. Uelmen responded, "They are all priority," without any further guidance.

90. Mr. Uelmen insisted that he attend performance reviews of Plaintiff's four subordinates, which he had not done in the past.

91. Mr. Uelmen consistently praised white female Sara Hoover despite Plaintiff's continued concerns regarding Ms. Hoover's attendance.

92. Mr. Uelmen explained to Mr. Dittman, a white male, that no employees would get raises this year, but stated that he would try to get one for Mr. Dittman. Mr. Uelmen did not make the same promise to Plaintiff nor to Ms. Perkins (African-American female) or Ms. Bailey (Indian female). Plaintiff also noticed that Mr. Uelmen praised white employees more than non-white employees.

## COUNT 1
2 U.S.C. § 1311(a)(1) – Failure to Accommodate

93. Plaintiff repeats and realleges paragraphs 1–92, above, as if fully set forth herein.
94. Defendant failed to provide reasonable accommodations for Plaintiff, a person with disabilities.
95. By and through its conduct, Defendant violated the CAA.
96. Defendant's actions were intentional, reckless, and malicious.
97. As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT 2
2 U.S.C. § 1311(a)(1) – Discrimination on the bases of gender, race, and disability

98. Plaintiff repeats and realleges paragraphs 1–97, above, as if fully set forth herein.
99. Defendant discriminated against Plaintiff on the basis of gender, race, and disability.
100. By and through its conduct, Defendant violated the CAA.
101. Defendant's actions were intentional, reckless, and malicious.
102. As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT 3
2 U.S.C. § 1311(a)(1) – Hostile Work Environment on the bases of gender, race, and disability

103. Plaintiff repeats and realleges paragraphs 1–102, above, as if fully set forth herein.

104. Defendant harassed Plaintiff and subjected her to a hostile work environment on the basis of gender, race, and disability.

105. By and through its conduct, Defendant violated the CAA.

106. Defendant's actions were intentional, reckless, and malicious.

107. As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## COUNT 4
2 U.S.C. § 1317—Intimidation, Retaliation, Reprisal

108. Plaintiff repeats and reallages paragraphs 1–107, above, as if fully set forth herein.

109. Defendant retaliated against Plaintiff for reporting safety violations and for engaging in EEO activity.

110. By and through its conduct, Defendant violated the CAA.

111. Defendant's actions were intentional, reckless, and malicious.

112. As a result, Plaintiff has suffered damages including lost wages and benefits, pain and suffering, emotional distress, and mental anguish.

## JURY DEMAND

Plaintiff demands a trial by jury on all Counts.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against Defendant on all counts, and award Plaintiff lost wages and benefits; compensatory damages in the amount of $300,000, or in an amount to be determined at trial, for pain and suffering and emotional distress; pre- and post-judgment interest; costs; attorneys' fees; liquidated damages; and any such other relief as is just and proper.

Date:  June 30, 2017                                RESPECTFULLY SUBMITTED,

                                                       Alan Lescht and Associates, P.C.

                                                       By:   /s/

                                                       Alan Lescht [441691]
                                                       Rani Rolston [974052]
                                                       1050 17th Street, NW, Suite 400
                                                       Washington, DC 20036
                                                       Tel:  (202) 463-6036
                                                       Fax:  (202) 463-6067
                                                       alan.lescht@leschtlaw.com
                                                       rani.rolston@leschtlaw.com
                                                       *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 30th day of June, 2017, a copy of the foregoing was served via the Court's electronic filing system on:

Marina Utgoff Braswell
U.S. Attorney's Office
Civil Division
555 4th Street, NW
Washington, DC 20530
(202) 252-2599
Marina.Braswell@usdoj.gov

John D. Uelmen
Office of Compliance
John Adams Building
110 Second Street, SE
Room LA 200
Washington, DC 20540
(202) 724-9247
juel@loc.gov