# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERRY R. WIGFALL, <br><br> *Plaintiff*, <br><br> v. <br><br> OFFICE OF COMPLIANCE, <br><br> *Defendant.* | Civil Action No. 16-cv-2332 (DLF) |

## **MEMORANDUM OPINION**

Terry Wigfall brings this action against her employer, the Office of Compliance, under the Congressional Accountability Act.[1] Wigfall claims that individuals at her workplace have discriminated against her on the basis of sex, race, and disability; subjected her to a hostile work environment; and retaliated against her for various actions she took. Before the Court is the Office of Compliance's Motion to Dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court will grant the motion and will dismiss the complaint without prejudice.

---

[1] The Congressional Accountability Act incorporates by reference certain provisions of Title VII, the Rehabilitation Act of 1973, and the Americans with Disabilities Act and applies them against Congress and legislative branch agencies. 2 U.S.C. §§ 1311(a)(1)–(3).

## I. BACKGROUND[2]

Terry Wigfall began working for the Office of Compliance (OOC), a federal legislative agency, in 2007. Second Am. Compl. ¶ 18. Around 2010,[3] Wigfall began working with John Uelmen, then a senior attorney. *Id.* ¶ 23. Uelmen is a white man, and according to Wigfall, he "had trouble interacting with non-white employees" and "frequently ignored" them "[f]rom the outset." *Id.* ¶¶ 22–23. In the fall of 2013, when OOC was considering Uelmen for the general counsel position, Wigfall "raised concerns" to OOC's executive director that "Uelmen was racist and sexist." *Id.* ¶¶ 34–35. OOC did not select Uelmen for the general counsel role in 2013, but he later became general counsel in 2015. *Id.* ¶ 37. From 2010 to the present, Wigfall alleges that Uelmen "has regularly engaged in rude and inappropriate behavior" including interrupting her at meetings and minimizing her achievements, while sparing Wigfall's white colleagues. *Id.* ¶ 38. Wigfall claims that "Uelmen's poor treatment of [her] intensified after she recommended to the Board that he not be chosen as General Counsel in 2013," *id.* ¶ 39, though her complaint does not allege any specific instances before 2015.

Wigfall was promoted to occupational safety and health (OSH) program manager in 2013. *Id.* ¶ 33. In that role, she completed three reports between August and October 2015 finding health and safety issues in cases filed by the Architect of the Capitol's Inspector General's Office employees. *Id.* ¶ 40. In October 2015, the general counsel (Uelmen's

---

[2] The facts here are recited as alleged in Wigfall's Second Amended Complaint, Dkt. 34, and are assumed true, as they must be in considering a motion to dismiss. *See Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018).

[3] In a section of her complaint entitled "History of discrimination within OOC," Wigfall recounts OOC's failure in 2010 to promote her to a position that she eventually obtained in 2013. *See* Second Am. Compl. ¶¶ 18–33. This incident is well outside the timeframe of Wigfall's 2016 administrative complaints and appears to be provided for background purposes, so the Court does not repeat it here.

predecessor, a white woman named Amy Dunning) told Wigfall that she intended to remove the findings, and Wigfall "strongly objected." *Id.* ¶ 41. On October 28, 2015, Dunning gave Wigfall a negative performance evaluation. *Id.* ¶ 43. Wigfall alleges that "[b]ecause of [her] negative performance evaluation, she was denied a bonus in 2015," *id.* ¶ 44, though she admits in her opposition to OOC's motion to dismiss that she learned of the bonus decision in September, Pl.'s Opp'n, Dkt. 37 at 9. Wigfall met with OOC's executive director on October 30 and November 5, and at both meetings she "expressed concerns of racial discrimination in the office." Second Am. Compl. ¶¶ 45–46.

On December 7, after investigating a complaint from another OOC employee, Wigfall informed management about mold in one of OOC's file rooms. *Id.* ¶¶ 47–51. OOC's executive director "became visibly upset and stated that there should be no findings." *Id.* ¶ 51. Sometime in December, Uelmen stopped processing Wigfall's report on this issue and "changed the process of OSH safety reports" so that "attorneys completed a final review without input from the OSH team," often resulting in attorneys removing OSH findings. *Id.* ¶ 52. And on December 9, after Wigfall had submitted calendars with inspection dates for the OSH team, Uelmen "returned the calendar proposal with additional job duties" that included "increas[ing] the schedule from 3 days of inspections per week to 4 days per week, and added inspections pursuant to the Americans with Disabilities Act." *Id.* ¶ 55. Wigfall believes this added work was retaliation for her mold-in-the-file-room findings. *Id.* ¶ 56.

In "spring 2016," an OOC attorney—Hillary Benson—started wearing mosquito repellant because she was pregnant and did not want to contract the Zika virus. *Id.* ¶ 57. Wigfall "immediately began having significant negative, physically disabling reactions to the repellant, including difficulty breathing," and her reactions "materially impacted her ability to perform her

3

job duties." *Id.* ¶ 58. She missed "numerous days of work" and had to work from an empty conference room when she did come in. *Id.* ¶ 61. Wigfall alleges she "asked for a reasonable accommodation"—she does not specify what—but that Uelmen dismissed her reactions as seasonal allergies. *Id.* ¶¶ 59–60. Wigfall alleges that she took two days of sick leave in April 2016 "to recover from bronchitis that she developed as a result of [Benson's] excessive use of insect repellant inside OOC offices." *Id.* ¶ 66. On April 18, Uelmen "acted aggressively" in a staff meeting, and Wigfall believes this behavior was retaliation for her accommodation request. *Id.* ¶ 67. On April 20, Uelmen sent Wigfall an expectations memo that was critical of Wigfall's job performance. *Id.* ¶ 68.

Wigfall filed her first counseling request with OOC on April 25, 2016, and she alleges in her complaint that she "discussed the issues contained above" in her first counseling request. *Id.* ¶ 69. She completed counseling and requested mediation on June 14; the mediation period ended on August 25. *Id.* ¶ 70.

At a May 2 staff meeting, Uelmen "did not permit [Wigfall] to speak" and "ignored her." *Id.* ¶ 71. At meetings on May 4 and May 18, Benson sat close to Wigfall, and Wigfall believes she did so intentionally despite knowing of Wigfall's bug spray sensitivity. *Id.* ¶¶ 72, 74. Uelmen ignored a May 11 email from Wigfall complaining about the repellant. *Id.* ¶ 73. On May 18, after Wigfall met with Architect of the Capitol staff to discuss cleaning the office to remove the bug spray smell, OOC's executive director "scolded" her. *Id.* ¶¶ 75–76. And while a cleaning did take place in late May 2016 that allowed Wigfall to work in her office, Wigfall "does not believe that the spring cleaning was related to her request for a reasonable accommodation" and alleges that OOC "wholly failed" to accommodate her or engage in an interactive process. *Id.* ¶¶ 77–80.

4

Wigfall alleges continuing "[r]acial and [g]ender [d]isparities" over the summer of 2016. In May and June, after Wigfall complained to Uelmen that one of her direct reports—a white woman—was habitually late and unresponsive to Wigfall's correction, Uelmen instructed Wigfall to write her up but then met with the employee and took her side. *Id.* ¶¶ 81–82. Wigfall further alleges that Uelmen "strongly encouraged [Wigfall] to discipline non-white employees against [her] judgment," but "refused to allow" her to discipline two white employees (including the tardy employee). *Id.* ¶ 84. Finally, at a July 18 meeting, Uelmen "ignored" Wigfall and instead directed questions to her subordinate, a white man. *Id.* ¶ 85.

On August 22, 2016, Wigfall filed a second request for counseling "as to the continued discrimination and retaliation that occurred after her first request in April 2016." *Id.* ¶ 86. She requested mediation on September 22, and mediation ended on October 24. *Id.* ¶ 87. On September 6, a few weeks after Wigfall's second counseling request, Uelmen "further increased [her] workload by requiring her to complete four employee evaluations" by September 9. *Id.* ¶ 88. Uelmen also attended performance review for Wigfall's subordinates—something he had not done before—and "consistently praised" the white female employee Wigfall had attempted to write up for tardiness. *Id.* ¶¶ 90–91. Uelmen also promised a white male employee he would help him get a raise, but did not make similar promises to minority employees and generally "praised white employees more than non-white employees." *Id.* ¶ 92.

Wigfall sued OOC on November 23, 2016. Dkt. 1. Her complaint—as amended, *see* Dkt. 34—lists four counts under the Congressional Accountability Act: failure to accommodate her disabilities; discrimination on the bases of gender, race, and disability; hostile work environment on the bases of gender, race, and disability; and retaliation. Each of her four counts "repeats and realleges" her entire complaint without specifying which acts are alleged to support

5

which counts, leaving the Court to parse the events recounted above for colorable claims of failure to accommodate, discrimination, hostile work environment, and retaliation.

## II. LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss an action or claim when the court lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A motion for dismissal under Rule 12(b)(1) "presents a threshold challenge to the court's jurisdiction." *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987). Federal district courts are courts of limited jurisdiction, and it is "presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Thus, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *Moran v. U.S. Capitol Police Bd.*, 820 F. Supp. 2d 48, 53 (D.D.C. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). "When ruling on a Rule 12(b)(1) motion, the court must treat the plaintiff's factual allegations as true and afford the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Jeong Seon Han v. Lynch*, 223 F. Supp. 3d 95, 103 (D.D.C. 2016) (quoting *Delta Air Lines, Inc. v. Export-Import Bank of U.S.*, 85 F. Supp. 3d 250, 259 (D.D.C. 2015)) (internal quotation marks omitted). Those factual allegations, however, receive "closer scrutiny" than they would in the Rule 12(b)(6) context. *Id.* Also, unlike when evaluating a Rule 12(b)(6) motion, a court may consider documents outside the pleadings to evaluate whether it has jurisdiction. *See Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). If the court determines that it lacks jurisdiction, the court must dismiss the claim or action. Fed. R. Civ. P. 12(b)(1), 12(h)(3).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In analyzing a 12(b)(6) motion, the Court will construe the complaint liberally in favor of the plaintiff and will grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged," but the Court need not accept legal conclusions or inferences unsupported by the facts alleged. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002); *Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 8 (D.D.C. 2018). The Court will grant a motion to dismiss only where a plaintiff's "well-pleaded factual allegations," even if true, do not "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

In analyzing the merits of Congressional Accountability Act (CAA) claims, "courts in this jurisdiction consistently have read the CAA to incorporate Title VII as well as other remedial federal statutes and, thus, have applied case law related to underlying remedial federal statutes, such as Title VII, in analyzing claims brought under both the antidiscrimination and antiretaliation provisions of the CAA." *Harrison v. Office of the Architect of the Capitol*, 68 F. Supp. 3d 160, 167–68 (D.D.C. 2014) (collecting cases).

### III. ANALYSIS

OOC raises both jurisdictional and merits-based challenges to Wigfall's claims. The Court addresses each of Wigfall's four counts in turn. As noted, because Wigfall's complaint does not specify which acts are alleged to form the basis of which counts, the Court identifies and analyzes potential theories of liability on which Wigfall's complaint could conceivably rest.

#### A. Count I: Failure to Accommodate

##### 1. Jurisdiction

For subject-matter jurisdiction to exist in a CAA case, a plaintiff must have satisfied the CAA's three-step process: (1) request counseling with OOC within 180 days of the alleged

7

violation; (2) request mediation within 15 days after receiving notice of the end of counseling; and (3) file a complaint between 30 and 90 days after receiving notice of the end of mediation. *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 702 (D.C. Cir. 2009). OOC argues that there is no subject-matter jurisdiction over Wigfall's failure-to-accommodate claim because "[t]here is no allegation that she completed counseling and mediation on this claim." Def.'s Mot., Dkt. 36 at 10; *see also Blackmon-Malloy*, 575 F.3d at 705 ("[I]t is apparent from the plain terms of the text that Congress intended counseling and mediation to be jurisdictional requirements."). But Wigfall alleges that she "discussed the issues contained above"—including her request for a reasonable accommodation and OOC's response—in her first request for counseling on April 25, and that she thereafter completed remediation. Second Am. Compl. ¶¶ 69–70. She alleges that she "filed her second request for counseling as to the continued discrimination and retaliation that occurred after her first request" on August 22 and thereafter completed mediation. *Id.* ¶¶ 86–87. And Wigfall's counseling and mediation request documentation clearly shows that she did, in fact, raise her failure-to-accommodate claim both times. *See* Pl.'s Opp'n Ex. A, Dkt. 37-1 at 10, 13.[4]

OOC also argues that there is no subject-matter jurisdiction over claims arising out of any events occurring after April 25 because Wigfall's complaint was filed too early to include any of

---

[4] OOC argues in reply that Wigfall has provided "no basis for the Court to consider such documents," Def.'s Reply, Dkt. 38 at 2, but the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Vasser v. McDonald*, 228 F. Supp. 3d 1, 11 (D.D.C. 2016) (taking judicial notice of informal and formal administrative complaints on a motion to dismiss). OOC also repeatedly insinuates that Wigfall's exhibits are somehow untrustworthy. *See* Def.'s Reply, Dkt. 38 at 2 (calling the documents "unauthenticated and unverified"), 5 (same, and putting "papers" in scare quotes), 6 (same), 7 (again putting "papers" in quotes). If Wigfall indeed submitted fake or altered documents to the Court, that is of course a serious matter. Absent a good-faith basis, it is inappropriate for OOC to suggest as much.

the events encompassed in her second round of counseling and mediation. Def.'s Mot., Dkt. 36 at 12. The CAA requires that civil actions be filed "not sooner than 30 days[] after the end of the period of mediation." 2 U.S.C. § 1404(b). Wigfall's second mediation period ended on October 24, 2016, and she filed her initial complaint on November 23. Compl. ¶ 87; Dkt. 1. Rule 6(a) of the Federal Rules of Civil Procedure, which governs computation of time for "any statute that does not specify a method of computing time," instructs courts to "exclude the day of the event that triggers the period"—here, the date mediation ended, October 24—and to "include the last day of the period"—here, the day the complaint was filed, November 23. Fed. R. Civ. P. 6(a)(1). That makes 30 days between the end of mediation and the filing of the complaint: 7 in October and 23 in November.

OOC nevertheless argues that § 1404 "creates a 30-day moratorium" period and that complaints filed on the 30th day are too early. Def.'s Mot., Dkt. 36 at 13. This is a misreading of the statute, which states that complaints may be filed "*not sooner than* 30 days[] after the end of the period of mediation." 2 U.S.C. § 1404(b) (emphasis added). Excluding the trigger date and including the final date—as Rule 6(a)(1) requires—makes November 23 the 30th day after the end of the mediation period. And Wigfall filed her complaint *on* November 23, *not sooner than* November 23. *Cf. Halcomb v. Office of the Senate Sergeant-at-Arms*, 563 F. Supp. 2d 228, 238 (D.D.C. 2008) (articulating filing period consistent with this approach). OOC's reading would fail to "include" the filing date, November 23, as Rule 6(a)(1)(C) instructs.[5]

---

[5] Neither of the two cases OOC cites warrants a different conclusion. In *Stevens v. Department of the Treasury*, the Supreme Court analyzed whether the Age Discrimination in Employment Act (ADEA), which disallows suit unless an employee "has given the Commission not less than thirty days' notice," means that an employee must file suit *within* or *after* 30 days of the notice. 500 U.S. 1, 6 (1991) (quoting 29 U.S.C. § 633a(d)). The Court stated that the statute required suit *after* giving 30 days' notice, not *within* 30 days of notice, and rejected the district court's

9

In sum, the Court concludes that it has subject-matter jurisdiction over Wigfall's failure-to-accommodate claim.

2. Merits

To state a failure-to-accommodate claim under the CAA,[6] Wigfall must show that (1) she was a qualified individual with a disability, (2) OOC had notice of her disability, and (3) OOC denied her request for a reasonable accommodation. *See Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014). Wigfall claims that she suffers from "bronchitis, allergies, [and] physical reactions to chemical substances" (apparently all tied to her bug spray sensitivity) and that she requested, but was denied, a reasonable accommodation. Second Am. Compl. ¶¶ 16, 59–66.

At least one district court in this Circuit has concluded that allergic reactions to substances in the workplace can constitute a disability, at least where the symptoms are not limited to the workplace. *See, e.g.*, *Morris v. Jackson*, 994 F. Supp. 2d 38, 46 (D.D.C. 2013) (allegations of mold allergy created genuine fact issue as to whether plaintiff was disabled where plaintiff "alleged that she experiences symptoms of her condition away from the workplace"); *see also Haynes v. Williams*, 392 F.3d 478, 483 (D.C. Cir. 2004) ("If the impact of an impairment can be eliminated by changing the address at which an individual works, that impairment is neither permanent nor long term."). The Court need not decide whether Wigfall's

---

"obvious[] misread." *Id.* The employee in that case had filed his complaint nearly seven months after giving notice; the Court did not address an on-the-day filing as in this case.

The Court finds unconvincing OOC's second case, an unreported and out-of-circuit decision in which a district court concluded in a footnote that a 60-day wait period in the ADEA required filing on the 61st day. *See Clark v. Nat'l Recognition Prods., Inc.*, No. 3:14-cv-287, 2015 WL 3929692, at *2 n.3 (S.D. Ohio Apr. 6, 2015).

[6] As noted above, the CAA incorporates provisions of the ADA and the Rehabilitation Act. Those two acts are interpreted coterminously. *Dave v. Lanier*, 681 F. Supp. 2d 68, 73 n.4 (D.D.C. 2010).

claims plausibly show a disability, however, because she has failed to allege any specific facts showing that she requested a reasonable accommodation. To be sure, Wigfall asserts multiple times that she requested a reasonable accommodation. *See* Second Am. Compl. ¶¶ 59, 62, 67, 77, 79. But whether a particular accommodation request is reasonable is a legal conclusion, *see U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) (interpreting "reasonable accommodation"), and courts need not accept a complaint's legal conclusions as true. Beyond general assertions, Wigfall's complaint never identifies any actual request or proposed accommodation.[7] "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*, 550 U.S. at 555 (alterations, citations, and internal quotation marks omitted). It is possible that Wigfall did make specific accommodation requests. But at this time, because her complaint lacks the level of factual matter that Rule 12(b)(6) requires, the Court will dismiss Count I without prejudice.

### B. Count II: Discrimination

#### 1. Jurisdiction

OOC argues that there is no subject-matter jurisdiction over Wigfall's discrimination claim to the extent it relies on OOC's denial of a bonus in 2015. The Court agrees.

An employee's request for counseling—which, as noted above, is a jurisdictional prerequisite—must be made "not later than 180 days after the date of the alleged violation." 2

---

[7] It comes closest in recounting Wigfall's discussion with Architect of the Capitol staff members regarding cleaning, and a subsequent reprimand from OOC's executive director. Second Am. Compl. ¶¶ 75–76. But that discussion cannot be the request that was denied, since Wigfall herself admits that the cleaning occurred—and actually alleviated the problem—and she "does not believe that the spring cleaning was related to her request for a reasonable accommodation." *Id.* ¶ 79.

11

U.S.C. § 1402(a). Wigfall's first request for counseling came on April 25, 2016. Second Am. Compl. ¶ 69. She alleges that she received a negative performance evaluation on October 28, 2015—just within the 180-day period—and that "[b]ecause of [her] negative performance evaluation, she was denied a bonus in 2015." *Id.* ¶¶ 43–44. But as OOC points out and Wigfall does not dispute, 2015 bonuses were awarded on September 28, 2015, and Wigfall knew of and questioned her bonus denial on September 29. *See* Def.'s Mot., Dkt. 36 at 9; Pl.'s Opp'n, Dkt. 37 at 9; *see also Jerome Stevens Pharm., Inc.*, 402 F.3d at 1253 (court may consider documents outside the pleadings to determine whether it has jurisdiction).

Wigfall argues that although she learned of the bonus denial in September, she did not receive the performance evaluation until October, she disputed her performance evaluation in December, and she did not "kn[o]w for certain" that she would not receive a bonus until OOC's executive director "made the final decision not to adjust [her] performance evaluation" in December. Pl.'s Opp'n, Dkt. 37 at 9. But Supreme Court precedent states that a claim accrues on the date an adverse employment decision is made and the employee is notified, and an employee's attempt to appeal that decision does not toll the 180-day window. *Del. State College v. Ricks*, 449 U.S. 250, 258–61 (1980); *see also Johnson-Parks v. D.C. Chartered Health Plan*, 713 F. Supp. 2d 39, 44 (D.D.C. 2010) ("An employer's refusal to undo a discriminatory decision is not a fresh act of discrimination." (quoting *Graehling v. Village of Lombard*, 58 F.3d 295, 297 (7th Cir. 1995))). The Court thus lacks jurisdiction over any claims arising out of OOC's bonus denial.

### 2. Merits

As this Court has explained, "[t]he appropriate standard for assessing a motion to dismiss" discrimination claims "resists a concise summation." *Thomas v. Wash. Metro. Area*

12

*Transit Auth.*, 305 F. Supp. 3d 77, 85 (D.D.C. 2018). But however the standard is articulated, a plaintiff clearly must allege some adverse employment action in order to avoid dismissal. *See Baird v. Gotbaum*, 662 F.3d 1246, 1248–50 (D.C. Cir. 2011). An adverse action in the discrimination context is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)). An employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Id.* (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).

Wigfall's complaint does not clearly identify which allegations she believes make out a discrimination claim or an adverse employment action, but her theory of the case could conceivably rely on any of the following[8]:

- OOC's failure to promote Wigfall to the position of OSH program manager in 2010, and its refusal to fill Wigfall's old position once she eventually became program manager in 2013. Second Am. Compl. ¶¶ 24–33.
- Dunning's decision to remove Wigfall's findings of health and safety issues from a report in October 2015. *Id.* ¶¶ 40–42.

---

[8] OOC characterizes Wigfall's allegations regarding additional job duties as a count II claim, but Wigfall's complaint alleges that the additional duties were imposed "in retaliation for her insistence that OOC issue findings of safety violations" in the mold room investigation. Second Am. Compl. ¶ 56. The Court therefore believes that this allegation is better analyzed as a retaliation claim under count IV and addresses it there.

Similarly, the Court views Wigfall's allegations of "rude and inappropriate behavior," *id.* ¶ 38, from Uelmen and other OOC staff as best situated within Wigfall's hostile work environment claim and thus analyzes those allegations under count III. Wigfall has not made any attempt to characterize those workplace slights as adverse employment actions for purposes of a discrimination claim, and the Court does not see how they could be.

13

- Wigfall's receipt of a negative performance evaluation from Dunning on October 28, 2015. *Id.* ¶ 43.
- Uelmen's decision to "stop[] processing [Wigfall's] report" regarding mold in one of OOC's file rooms and his subsequent decision to "change[] the process of OSH safety reports, whereby attorneys completed a final review without input from the OSH team." *Id.* ¶ 52.
- Uelmen's comment to another employee (a white male) that he would try to get that employee a raise even though "no employees would get raises this year." *Id.* ¶ 92.
- Uelmen's disagreement with Wigfall about the appropriate level of discipline for Wigfall's subordinates. *Id.* ¶¶ 81–84.

None of these allegations saves count II from dismissal: the hiring decisions in 2010 and 2013 are well outside the 180-day timeframe from Wigfall's first counseling request in April 2016, and the remaining allegations do not rise to the level of an adverse employment action.

Wigfall's disagreement with Dunning over health and safety findings did not result in any significant change in employment status, but rather resulted simply in Wigfall's boss editing her report. Similarly, Uelmen's decisions to stop processing Wigfall's "mold report" and to change the process for future reports are insufficient, as "[c]hanges in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1556–57 (D.C. Cir. 1997); *cf. Rhone v. U.S. Capitol Police*, 865 F. Supp. 2d 65, 69 (D.D.C. 2012) ("Removal of the authority to sign documents is not a 'significant change' in employment status and does not rise to the level of an objectively tangible harm."). With respect to disciplinary decisions, although Wigfall characterizes her disagreements with Uelmen as a "[r]emoval of supervisory responsibilities," Pl.'s Opp'n, Dkt. 37 at 8, her complaint makes clear that Uelmen did not revoke her supervisory authority—he simply overrode her decisions on particular personnel and disciplinary issues. *See* Second Am. Compl. ¶ 84 (noting that Uelmen encouraged Wigfall to discipline some employees but prevented her from disciplining others). And with

14

respect to Uelmen's alleged comment to another employee about trying to get him a bonus, Wigfall makes no allegation that *she* was wrongfully denied a bonus (or even that the other employee eventually received one). This allegation amounts to a single comment from a supervisor that apparently had no effect at all on Wigfall's—or her coworker's—"terms, conditions, or privileges of employment or future employment opportunities." *Douglas*, 559 F.3d at 552 (quoting *Forkkio*, 306 F.3d at 1131).[9]

That leaves a single negative performance evaluation. Though Wigfall points to *Walker v. Johnson*, 798 F.3d 1085 (D.C. Cir. 2015), for the proposition that a poor performance review qualifies as an adverse action, that case did not hold that performance reviews are *per se* adverse but rather considered "whether discrimination or retaliation caused a significant, tangible harm." *Id.* at 1095. Likewise, the D.C. Circuit has made clear that "performance reviews typically constitute adverse actions only when attached to financial harms." *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (collecting cases). Wigfall alleges that her poor performance review somehow resulted in the denial of a bonus a month before that review had even occurred. Setting aside the logical problem with that allegation, the bonus denial in any event falls outside the Court's jurisdiction. Without it, Wigfall has not tied her performance review to any other harm. And the review standing alone cannot constitute an adverse action.

Because Wigfall has failed to allege any adverse employment actions to sustain her discrimination claims, the Court will dismiss count II without prejudice.

### C. Count III: Hostile Work Environment

1. Jurisdiction

---

[9] In her brief in opposition, Wigfall also lists "[a]ddition of menial job functions" as an adverse action. Pl.'s Opp'n, Dkt. 37 at 8. Whether that refers to the December 9 or September 6 incident, those allegations are addressed in part III.D.

15

The only jurisdictional question for Wigfall's hostile work environment claim is whether the Court can consider acts that occurred after April 25. For the reasons expressed in part III.A.1 of this opinion, the Court concludes that it has jurisdiction over the claims included in Wigfall's second round of counseling and mediation, including acts that occurred after April 25.

2. Merits

A hostile work environment exists where a plaintiff's employer subjects her to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Baloch*, 550 F.3d at 1201 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). In assessing whether a hostile work environment exists, courts "look[] to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Id.*

Wigfall's allegations fail to satisfy the "severe or pervasive" standard. She makes general allegations that her supervisor, Uelmen, "regularly" engages in "rude and inappropriate behavior" toward her, including interrupting her at meetings and minimizing her achievements. Second Am. Compl. ¶ 38. She also alleges generally that "she and other minority employees were marginalized and ignored by white staff, and that their feedback on OSH investigations was frequently ignored." *Id.* ¶ 46. And she alleges a few specific instances of such conduct: disagreements with Dunning over health and safety findings in one of Wigfall's reports, *id.* ¶ 41; disagreements with OOC's executive director about findings of mold in a separate report, *id.* ¶ 51; comments from Uelmen and other coworkers indicating they did not believe Wigfall had a severe allergy to bug spray and asking her to apologize to the woman wearing the bug spray, *id.* ¶¶ 64–65, 78; an expectations memo from Uelmen accusing her of disregarding her duties, *id.* ¶

16

68; being interrupted and ignored at staff meetings on May 2 and July 18, *id.* ¶¶ 71, 85; disagreements with Uelmen over personnel discipline, *id.* ¶¶ 81–84; and praise from Uelmen for other (white) employees but not for Wigfall, *id.* ¶¶ 90–92.

Wigfall's list of grievances is long, but "a long list of trivial incidents is no more a hostile work environment than a pile of feathers is a crushing weight." *Baird*, 792 F.3d at 172. The *Baird* court confronted a long list of "name-calling, rude emails, lost tempers and workplace disagreements" and considered it "the kind of conduct courts frequently deem uncognizable under Title VII." *Id.* at 171; *see also id.* (collecting cases rejecting hostile work environment claims). Here, Wigfall's allegations amount to nothing more—and probably much less—than the list of grievances rejected in *Baird*. The Court will therefore dismiss count III without prejudice.

### D. Count IV: Retaliation

#### 1. Jurisdiction

OOC argues that the Court lacks jurisdiction over Wigfall's claim that she was retaliated against in her October 28 performance review and when Uelmen allegedly imposed additional job duties on December 9. For the reasons expressed in part III.A.1 of this opinion, the Court finds Wigfall's allegations and her underlying administrative documents sufficient to establish jurisdiction. *See* Pl.'s Opp'n Ex. A, Dkt. 37-1 at 6 ("I believe that Amy Dunning and John Uelmen retaliated against me for raising health and safety concerns and for my refusal to take my staff into the unsafe work environment of the Senate mail facility. This incident was mentioned in the negative performance evaluation."); *id.* at 9 ("I believe that John Uelemen [sic] and/or Amy Dunning misinformed the OOC Board about an inspection, and, they claimed, as a result the Board had to pass a resolution to force my staff to do additional work.").

To the extent Wigfall alleges a retaliation claim predicated on Uelmen's decision to "further increase[] [Wigfall's] workload" on September 6, 2016, Second Am. Compl. ¶ 88, the Court lacks jurisdiction to review that event. It took place after Wigfall's second request for counseling on August 22, and Wigfall does not allege that she ever engaged in a third round of counseling and mediation. "[T]he completion of counseling and mediation for one set of violations does not give the court jurisdiction over related claims of retaliation that occurred after counseling had commenced; the administrative remedies must be exhausted for each claim." *Gordon v. Office of the Architect of the Capitol*, 750 F. Supp. 2d 82, 92 (D.D.C. 2010).

2. Merits

Wigfall's complaint alleges four potential instances of retaliation: (1) that Wigfall's poor performance evaluation on October 28 was retaliation for complaining to Dunning about safety violations, Second Am. Compl. ¶¶ 41–43; (2) that Uelmen imposed "additional job responsibilities" on December 9 in retaliation for Wigfall's findings about mold in the file room, *id.* ¶¶ 55–56; (3) that Uelmen "acted aggressively" toward Wigfall in a meeting and sent a memo accusing her of disregarding her job duties in retaliation for requesting a reasonable accommodation, *id.* ¶¶ 67–68; and (4) that Uelmen ignored her and that OOC's executive director scolded her shortly after her first request for counseling, while she was attempting to deal with her bug spray allergy, *id.* ¶¶ 71–76.

None of these complaints is actionable. To state a claim for retaliation under the CAA, a plaintiff must show (1) that she engaged in statutorily protected activity; (2) that the defendant took an adverse employment action against her; and (3) a causal connection between the two. *Halcomb*, 563 F. Supp. 2d at 245. In assessing a retaliation claim under the CAA, the standards

18

and precedent from the CAA's "underlying remedial federal statutes" apply. *Harrison*, 68 F. Supp. 3d at 167–68.

Wigfall's first two (potential) theories of retaliation fail on the first element, as alleged. She alleges that her poor performance review and additional job duties were retaliation for complaining about safety violations and findings about mold in a file room, respectively. But an employee "must in some way allege unlawful discrimination" for her conduct to qualify as protected activity. *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). Because complaints about safety violations and mold do not "allege unlawful discrimination," they cannot form the basis for a retaliation claim.[10]

The second two theories fail because they do not allege any adverse employment action. In the retaliation context, an adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Mogenhan v. Napolitano*, 613 F.3d 1162, 1166 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). But "sporadic verbal altercations or disagreements do not qualify as adverse actions for purposes of retaliation claims." *Baloch*, 550 F.3d at 1199; *see also Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) (finding COO's statement "[y]our career is dead in EDF if you file the claim" insufficient in light of company's extensive efforts to accommodate plaintiff); *Baloch*, 550 F.3d at 1199 (finding supervisor's "profanity-laden yelling . . . did not meet the requisite level of regularity or severity to constitute material adversity for purposes of a retaliation claim"). Wigfall's allegations of "aggressive[]" behavior in meetings, a critical memo, being ignored, and a "scold[ing]" do not suffice.

---

[10] For the same reason, because Wigfall does not allege any discriminatory motive but rather a motive based on work-related disagreements, the additional job duties claim could not survive even if the Court analyzed it as a discrimination claim under count II.

Because Wigfall's complaint, as alleged, fails to state a claim for retaliation, the Court will dismiss Count IV without prejudice.

## CONCLUSION

For the foregoing reasons, the Court grants OOC's motion to dismiss and dismisses the complaint without prejudice. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: September 18, 2018